**In re FINOVA CAPITAL CORPORA-TION, Reorganized Debtor.**

**No. 01–00698 (PJW).**

United States Bankruptcy Court,
D. Delaware.

Dec. 6, 2006.

---

Rebecca L. Booth, Morgan Lewis & Bockius, Philadelphia, PA, Mark D. Collins, Mark A. Kurtz, Jason M. Madron, Michael Joseph Merchant, Marcos Alexis Ramos, Richards, Layton & Finger, P.A., Wilmington, DE, for Reorganized Debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PETER J. WALSH, Bankruptcy Judge.

These Findings of Fact and Conclusions of law are with respect to reorganized debtor FINOVA Capital Corporation's ("FINOVA") objection to the claim of Olsen Industries, Inc. ("Olsen Industries"). Prior to filing its bankruptcy petition FINOVA was a secured creditor in the bankruptcy case of Consolidated Industries, Inc. ("Consolidated"). Olsen Industries' claim ("Claim") arises out of FINOVA's alleged breach of a March 7, 2000 agreement ("Letter Agreement") under which Olsen Industries agreed to serve as a stalking-horse bidder in the public foreclosure sale of substantially all the assets of Consolidated. Olsen Industries was not the successful bidder in the foreclosure sale.

Olsen Industries filed the Claim against FINOVA alleging lost profit and other damages in the amount of $12 million. (DTE 114.) Olsen Industries attached the Letter Agreement to the Claim as well as a short "Description of Claim" which alleged—without support—that it had suffered $12 million in damages as a result of FINOVA's breach of the Letter Agreement. (*Id.*)

The Court conducted a trial on the Claim objection on September 11–14, 2006. At trial, the Court bifurcated the issue of damages from the issue of liability. (Trial Tr. (9/11) pp. 226–227.) This ruling on liability obviates the need for a trial on the issue of damages.

In the trial, Olsen Industries presented the testimony of the following live witness:

Thomas Pointer ("Pointer"): an employee of TOM Capital Associates ("Tom Capital"); former secretary and director of Olson Industries; former secretary, chief financial officer and chief operating officer of Olsen Technology, Inc. ("OTI"), an affiliate of Olsen Industries; and former secretary and chief financial officer of Canadian Manoir Industries, Ltd. ("Canadian Manoir"), Olsen Industries' parent corporation.

Finova presented the testimony of the following live witnesses:

Thomas Herron ("Herron"): FINOVA's lead representative responsible for overseeing and administering FINOVA's debt with Consolidated.

Richard Levy ("Levy"): an attorney with the firm Latham & Watkins, LLP who represented FINOVA in connection with the Letter Agreement and the sale of Consolidated's assets.

Additionally, Olsen and FINOVA designated portions of deposition transcripts of

the following individuals whose testimony was read into the record:

Paul Champagne ("Champagne"): former vice president of TOM Capital and director of Canadian Manoir who also provided services to OTI and Olsen Industries.

Judy Calton ("Calton"): an attorney with the firm Honigman, Miller, Schwartz & Cohen, LLP who represented Olsen Industries in its efforts to purchase the Consolidated's assets.

James Carlberg ("Carlberg"): an attorney with the firm Bose, McKinney & Evans, LLP who represented Allstyle Coil Co. ("Allstyle"), the company whose affiliate purchased FINOVA's claim against Consolidated and successfully bid for Consolidated's assets.

Robert Magee ("Magee"): vice president of Allstyle.

Jill Harness: an employee and Rule 30(b)(6) representative of FINOVA.

### FINDINGS OF FACT

#### I. *FINOVA Capital Corporation*

1. FINOVA and its former debtor affiliates were in the business of providing "middle market" businesses with a broad range of financing and capital needs. (Admitted Facts ¶ 1.)[1]

2. FINOVA and its debtor affiliates filed voluntary petitions pursuant to chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S. § 101 et seq. (the "Bankruptcy Code") in this Court on March 7, 2001. (Admitted Facts ¶ 2.)

#### II. *FINOVA's Consolidated Debt*

3. Consolidated was a manufacturer and distributor of gas furnaces headquartered in the State of Indiana. (*Id.* at ¶ 7.)

4. FINOVA made certain loans to Consolidated pursuant to a Loan and Security Agreement, dated January 6, 1998 and certain related documents. (*Id.* at ¶ 8.) Consolidated's borrowings under the prepetition loan documents were secured by a security interest in substantially all of Consolidated's assets. (*Id.*)

5. On May 28, 1998 Consolidated filed a petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Indiana (the "Indiana Bankruptcy Court"). (*Id.* at ¶ 9.)

6. Following the petition date, FINOVA and Consolidated entered into a series of seven stipulations authorizing Consolidated's use of "cash collateral" (as defined under section 363 of the Bankruptcy Code), all of which were approved by orders of the Indiana Bankruptcy Court. As additional security for Consolidated's use of cash collateral, the cash collateral orders granted FINOVA replacement liens in certain assets of Consolidated. (*Id.* at ¶ 10.)

7. On March 5, 1999, the Indiana Bankruptcy Court entered an order authorizing Consolidated to obtain additional financing from FINOVA pursuant to the same terms and conditions as existed prior to the petition date.

---

1. Citations herein are to the Parties' Statement of Facts Which Are Admitted and Require No Proof, attached as Exhibit A to the parties' Pretrial Order (the "Admitted Facts"), FINOVA's trial exhibits ("DTE") and Olsen Industries trial exhibits ("PTE"). Citation to a particular witness' testimony at trial is cited by reference to the witness' name, date of testimony and page reference to the corresponding day's trial transcript. For example, testimony to the September 12, 2006 trial testimony of Thomas Pointer would be "Pointer Test. (9/12) p. —". General references to the trial transcript are cited as "Trial Tr."

8. Consolidated's borrowings under the debtor-in-possession loan documents were secured by an interest in all real and personal property of Consolidated, whether arising or acquired prior to, on or after the petition date. (*Id.* at ¶ 12.)

### III. *The Stay Relief Order*

9. On December 20, 1999, the Indiana Bankruptcy Court entered an order approving the limited extension of debtor-in-possession financing, by which FINOVA agreed to a limited extension of Consolidated's credit facility through January 7, 2000 notwithstanding FINOVA's position that certain events of default had occurred under the DIP Loan Department. (PTE 21 ¶¶ 1, 4.)

10. On December 30, 1999, FINOVA filed an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing its liens on the collateral. Consolidated responded by filing (i) an emergency motion seeking authority to use FINOVA's cash collateral and (ii) a complaint against FINOVA for a declaratory judgment that Consolidated had met all conditions under the loan documents necessary to continue borrowing. (Admitted Facts ¶ 14.)

11. On February 15, 2000, the Indiana Bankruptcy Court entered an agreed order resolving the stay motion, the cash collateral motion and the declaratory complaint. (*Id.* at ¶ 15; PTE 22.) Among other things, that order authorized Consolidated to continue borrowing under the credit facility through March 10, 2000 in order to wind down its operations and liquidate its assets. (PTE 22 ¶ 6.) The order further provided FINOVA with the ability to obtain stay relief without further application or motion (upon three days written notice) in the event that, as of March 1, 2000, amounts remained outstanding under the loan documents and

Consolidated had not filed a motion to sell or otherwise dispose of the collateral on terms acceptable to FINOVA. (*Id.* at ¶ 9.)

### IV. *Consolidated's Marketing of the Consolidated Assets*

12. From and after the Consolidated's petition, Consolidated attempted to conclude an agreement with third parties for the purchase of substantially all of Consolidated's principal manufacturing assets ("Consolidated Assets"). (DTE 9, 15, 53, 60.) Consolidated marketed the Consolidated Assets to entities engaged in the business of manufacturing and/or distributing furnaces. (Pointer Test. (9/11) p. 12 line 16—p. 13 line 7; Magee Test. (9/14) p. 40 line 15—p. 42 line 15; DTE 53, 60.)

### V. *Olsen Industries and Persons Related to Olsen Industries*

13. Claimant Olsen Industries was incorporated under the laws of Ontario, Canada on or about August 12, 1997. (Admitted Facts ¶ 3.) From August 12, 1997 to the present, Olsen Industries was a 100% owned subsidiary of Canadian Manoir. (*Id.* at ¶ 4.)

14. OTI also was a 100% owned subsidiary of Canadian Manoir. (*Id.* at ¶ 5.) During the relevant time period and until approximately December 29, 2000, OTI was in the residential oil heating furnace manufacturing and distribution business in Canada and the United States. (*Id.* at ¶ 6; DTE 195; Pointer Test. (9/11) p. 143 lines 8–24.)

15. During the relevant time period and until approximately December 29, 2000, Canadian Manoir's business operations consisted almost exclusively of the management and operation of OTI's residential oil heating furnace manufacturing and distribution business. (DTE 163–167,

169; Pointer Test. (9/11) p. 182 line 11—p. 192 line 11.)

16. TOM Capital is an entity which describes itself as a private merchant bank based in Calgary, Alberta. (DTE 9; Pointer Test. (9/11) p. 6 lines 11–14.) James T. Grenon ("Grenon") was one of the founders of TOM Capital. (DTE 9; Champagne Test. (9/12) p. 185 lines 6–19.) Grenon was a director of Canadian Manoir. (DTE 163–166, 169.) At all relevant times, Grenon, either directly or indirectly, was also a shareholder of Canadian Manoir. (DTE 163–166, 169.)

17. From approximately 1995 through 2003, Champagne worked for TOM Capital in the position of Vice President. (Champagne Test. (9/12) p. 182 lines 18–20; p. 201 line 25—p. 202 line 21.) He reported directly to Grenon. (Champagne Test. (9/12) p. 184 line 18—p. 185 line 5.) As part of his duties on behalf of TOM Capital, Champagne provided services to entities in which TOM Capital and/or Grenon maintained an interest and he represented TOM Capital's interest with respect to any duties he performed on behalf of entities in which TOM Capital and/or Grenon maintained an interest. (*Id.* at p. 184 line 18—p. 185 line 1, p. 192 lines 18–21, p. 193 line 21—p. 194 line 5, p. 195 lines 1–4, p. 197 lines 2–14.) At all relevant times, Champagne was a director of Canadian Manoir. (DTE 163–166, 169.) Champagne also provided services to OTI and Olsen Industries. (Champagne Test. (9/12) p. 196 line 22—p. 200 line 21.)

18. From approximately 1996 to the present, Pointer has been employed by TOM Capital. (Pointer Test. (9/11) p. 6 lines 6–10.) Pointer also provided services to OTI and Olsen Industries. (*Id.* at p. 7 line 13—p. 8 line 13.) Champagne provided advice and assistance to Pointer in evaluating potential acquisition and related opportunities. (Champagne Test. (9/12) p.

200 lines 2–23.) Pointer also reported to Champagne in his capacity as a director of Canadian Manoir. (Pointer Test. (9/12) p. 42 lines 13–21.)

## VI. *Canadian Manoir and OTI's Negotiations With Consolidated*

19. Beginning no later than August 1998, Consolidated engaged in direct discussions with Canadian Manoir and OTI regarding a potential transaction related to (among other things) the sale of the Consolidated Assets. (DTE 8; Pointer Test. (9/12) p. 41 lines 3–16.)

20. Prior to engaging in discussion with Consolidated regarding a potential transaction, Canadian Manoir and OTI knew that Consolidated had filed under chapter 11 and remained in bankruptcy. (DTE 9; Pointer Test. (9/12) p. 41 lines 17–20; Champagne Test. (9/12) p. 210 line 11—p. 212 line 6.)

21. On or about December 15, 1998, Canadian Manoir first made a written offer to Consolidated regarding a potential sale transaction concerning the Consolidated Assets. (DTE 15; Champagne Test. (9/12) p. 222 line 13—p. 223 line 18.) Canadian Manoir, OTI and/or Olsen Industries continued to engage in direct discussions with Consolidated regarding a potential sale transaction through February 2000. (DTE 15, 18–19, 26, 28–30, 35–36, 49, 55–57, 62.)

22. Although Canadian Manoir, OTI and/or Olsen Industries engaged in direct discussions with Consolidated for well over a year, neither Canadian Manoir, OTI or Olsen Industries was ever able to reach a final agreement with Consolidated regarding the purchase of the Consolidated Assets. (PTE 20.)

23. Aside from Canadian Manoir, OTI and/or Olsen Industries, Consolidated also received written offers from Allstyle to

purchase the Consolidated Assets. (DTE 53, 59.)

### VII. *Background Leading to Letter Agreement*

24. During the relevant time period, Herron was employed by FINOVA. (Herron Test. (9/13) p. 38 line 15—p. 39 line 8.) Herron first began to work on the Consolidated matter after Consolidated filed its chapter 11 case. (*Id.* at p. 39 line 13—p. 40 line 7.) Herron was the lead FINOVA representative responsible for overseeing and administering FINOVA's debt with Consolidated. (*Id.* at p. 40 lines 8–13.)

25. FINOVA's ultimate goal with respect to Consolidated was to maximize the value of FINOVA's loan to Consolidated and to limit FINOVA's related loss, if any. (*Id.* at p. 42 lines 4–6.) Herron believed that FINOVA could maximize its value and minimize its loss through the sale to a third party of FINOVA's Consolidated debt. (*Id.* at p. 42 line 7—p. 43 line 2.)

26. Herron spoke with different third parties at various points in time regarding Consolidated, Consolidated's Assets and FINOVA's Consolidated debt. (*Id.* at p. 95 lines 1–18.) Herron consistently informed parties who contacted him regarding Consolidated that FINOVA would be willing to sell its underlying Consolidated debt. (*Id.* at p. 42 line 20—p. 43 line 18.)

27. Herron first met Champagne during the late summer or early fall of 1999 in Toronto, Canada. (*Id.* at p. 43 lines 3–11.) At that time, Champagne was engaged in direct discussions, on behalf of Canadian Manoir and/or OTI, with Consolidated regarding the Consolidated Assets. (DTE 18–19, 26; Herron Test. (9/13) p. 43 lines 6–18.) Herron informed Champagne that

FINOVA would be willing to sell its Consolidated debt and explained that the purchaser of FINOVA's Consolidated debt would succeed to FINOVA's rights as the secured lender under FINOVA's Consolidated debt. (Herron Test. (9/13) p. 43 lines 13–21, p. 46 lines 2–12.)

28. Champagne did not agree to purchase FINOVA's Consolidated debt. (*Id.* at p. 43 lines 16–21.) Nevertheless, Herron thereafter continued to offer to sell FINOVA's Consolidated debt to the Champagne related companies as well as other potentially interested third parties. (*Id.* at p. 43 lines 22–24, p. 45 line 7—p. 46 line 8; Champagne Test. (9/13) p. 34 lines 10–22.) [2]

29. After his late summer or early fall 1999 discussions with Herron, Champagne continued to negotiate directly with Consolidated regarding a purchase of the Consolidated Assets. (DTE 26, 31; PTE 20.)

30. By February 2000, FINOVA determined that liquidation of the Collateral was the best course of action given Consolidated's deteriorating financial condition and FINOVA's concerns regarding the integrity and value of the Collateral. (Herron Test. (9/13) p. 68 line 25—p. 69 line 17.)

31. The financing order established the procedure for FINOVA to obtain relief from the automatic stay upon three days notice. (PTE 22 ¶¶ 9–10.) At the same time, FINOVA continued its efforts to find a buyer for its debt as well as to promote an active market for potential purchasers of the Consolidated Assets. (Herron Test. (9/13) p. 51 lines 2–7, p. 95 lines 1–18, p. 95 line 22—p. 96 line 4.)

---

**2.** Indeed, Herron offered to sell FINOVA's Consolidated debt to Champagne prior to the execution of the Letter Agreement, and again, as late as mere days preceding the Foreclosure Sale. (Herron Test. (9/13) p. 45 line 7—p. 46 line 8, p. 54 line 14—p. 55 line 13; Champagne Test. (9/13) p. 34 lines 19–22.)

## VIII. *The March 7, 2000 Letter Agreement*

32. Between approximately March 2, 2000 and March 7, 2000, the parties negotiated the terms of an agreement for Olsen Industries to submit an opening bid at the public foreclosure sale ("Foreclosure Sale") of Consolidated's principal manufacturing assets (the "Assets"). (DTE 65–66, 68, 70; Herron Test. (9/13) p. 73 lines 4–12.)

33. During the course of the parties' negotiations regarding the Letter Agreement, Olsen Industries was represented by Calton of the law firm of Honigman Miller Schwartz and Cohn. (PTE 24; Pointer Test. (9/12) p. 102 line 19—p. 103 line 16.) FINOVA was represented by Levy of the law firm of Latham & Watkins.

34. During the parties' negotiations, Herron again offered to sell FINOVA's Consolidated debt to Olsen Industries. (Herron Test. (9/13) p. 46 line 4—p. 47 line 5.) Again, for its own reasons,[3] Olsen Industries declined to purchase the Consolidated debt. (*Id.* at p. 46, lines 13–16.) In response, Herron expressly told Champagne that FINOVA would not waive its right to bid its Consolidated debt at the Foreclosure Sale. (*Id.* at p. 46 line 21—p. 47 line 5, p. 101 line 15—p. 102 line 19.) Herron did not intend to waive FINOVA's right to credit bid at the Foreclosure Sale or its right to sell its underlying Consolidated debt by entering into the Letter Agreement and Herron did not authorize anyone, including FINOVA's counsel, to waive FINOVA's rights. (*Id.* at p. 48 lines 14–25, p. 50 lines 12–17.)

35. The parties ultimately executed the Letter Agreement on March 7, 2000. Under the Letter Agreement, Olsen Indus-

tries agreed to submit an opening bid of $2.5 million for the Assets at the Foreclosure Sale to be conducted pursuant to section 9–504 of the Uniform Commercial Code (the "UCC") as adopted by the State of Indiana at the time. (DTE 70.) As of March 7, 2000 Consolidated owed Finova $4.1 million. (DTE 91 p. 1.)

36. The Letter Agreement, as executed by the parties, does not contain any provision which expressly precludes FINOVA from bidding its credit at the Foreclosure Sale. (*Id.*) Indeed, the words "credit bid" do not appear in the Letter Agreement. (*Id.*) The Letter Agreement, as executed by the parties, also does not contain any provision which expressly restricts FINOVA's right to sell its Consolidated debt. (*Id.*)

37. Herron did not believe that the Letter Agreement restricted FINOVA's right to sell its Consolidated debt or credit bid at the Foreclosure Sale. (Herron Test. (9/13) p. 47 line 24—p. 48 line 5.) Herron testified that he would not have executed the Letter Agreement if he had understood that it affected FINOVA's right to credit bid at the Foreclosure Sale. (*Id.* at p. 48 lines 14–22.) Herron viewed FINOVA's right to credit bid or sell its debt as important rights, and not ones which FINOVA was willing to waive. Instead, Herron credibly testified that he did not view Olsen Industries offer as sufficient, from a financial perspective, to compensate FINOVA for the waiver of its right to credit bid or sell its Consolidated debt. (*Id.* at p. 48 line 14—p. 49 line 5.)

38. Levy did not believe that the Letter Agreement restricted FINOVA's right to sell its underlying Consolidated debt.

---

3. For example, Champagne appeared to believe that the purchaser of FINOVA's debt might be exposed to liability associated with the Consolidated Assets. (Champagne Test.

(9/12) p. 254 line 23—p. 255 line 25; Champagne Test. (9/13) p. 34 line 23—p. 35 line 10; Herron Test. (9/13) p. 46 lines 13–16.)

(Levy Test. (9/13) p. 136 line 2—p. 139 line 6.) Levy also did not believe that the Letter Agreement affected FINOVA's right to credit bid at the Foreclosure Sale and he did not intend to waive FINOVA's right to credit bid at the Foreclosure Sale by the Letter Agreement. (*Id.* at p. 124 line 12—p. 126 line 2, p. 127 lines 4–17.) In fact, Levy specifically reviewed the Letter Agreement to assure that no provision of the Letter Agreement affected FINOVA's right to credit bid at the Foreclosure Sale. (*Id.* at p. 125 lines 5–12.) If he had found a provision which even impliedly might have affected FINOVA's right to credit bid, Levy's intent was to cut that language from the agreement. (*Id.* at p. 127 lines 4–8.)

39. For example, Olsen Industries originally proposed that the term "qualified bidder" under the Letter Agreement include a requirement that in order to be a "qualified bidder" at the Foreclosure Sale, the bidder would have to demonstrate prior to the Foreclosure Sale that it had the capacity to close on the acquisition of the Assets on a cash basis. (*Id.* at p. 128 line 21—p. 130 line 2; PTE 25.) Levy deleted that language from a draft of the Letter Agreement and Olsen Industries accepted Levy's change. (Levy Test. (9/13) p. 125 lines 5–12, p. 128 line 21—p. 130 line 4; Pointer Test. (9/11) p. 42 lines 9–14; PTE 25, 29.) Further, Levy had no conversations with Olsen Industries nor its counsel regarding FINOVA's right to credit bid and Olsen Industries did not tell FINOVA that it intended the Letter Agreement to prevent FINOVA's from credit bidding. (Levy Test. (9/13) p. 126 lines 3–17; Pointer Test. (9/12) p. 99 lines 21–22, p. 100 lines 16–25.)

40. Levy, like Herron, understood that FINOVA's ability to sell its underlying debt was an important and valuable right. As explained by Levy, it is not unusual for a stalking-horse bidder (such as Olsen Industries here), both before a sale and after a sale but prior to closing, to assert a contractual or other breach by the secured party allegedly sufficient to support nonperformance by the stalking-horse bidder. Given this reality, Levy persuasively explained that the secured party's retention of its right to credit bid or sell its debt is necessary to protect the secured party (here, FINOVA) from unforeseen circumstances. For example, without these protections the stalking horse could withdraw from the sale or assert unreasonable demands to closing, or a more interested bidder that required more time to conduct diligence could appear. (Levy Test. (9/13) p. 127 line 13—p. 128 line 5, p. 178 line 17—p. 179 line 11.) Herron's business judgment, that FINOVA's best opportunity to minimize its loss was through the sale of its debt (Herron Test. (9/13) p. 42 line 7—p. 43 line 2), is consistent with Levy's testimony.

41. Olsen Industries admits that it did not discuss FINOVA's right to credit bid with FINOVA prior to entering into the Letter Agreement. (Pointer Test. (9/12) p. 99 lines 21–22, p. 100 line 17, p. 100 line 21.)

42. Calton admitted that she does not recall any of the negotiations which preceded the parties' execution of the Letter Agreement. (Calton Test. (9/13) p. 201 lines 14–16.) Indeed, Calton's lack of recollection regarding the relevant underlying events and circumstances was nearly complete. For example, Calton did not recall (i) whether she ever represented Olsen Industries (*Id.* at p. 196 line 25—p. 197 line 2), (ii) when she was first engaged by Canadian Manoir (*Id.* at p. 197 lines 20–23), (iii) the name of her client contact, (iv) whether she negotiated the terms of the Letter Agreement (*Id.* at p. 202 lines 20–22), (vi) whether the parties exchanged

drafts of the Letter Agreement (*Id.* at p. 202 lines 16–19), (vii) whether there were any phone calls discussing the terms of the Letter Agreement (*Id.* at p. 202 lines 20–22) or (viii) whether her client(s) made any statements at the Foreclosure Sale. (*Id.* at p. 224 lines 17–18.) At a minimum, Calton provided no support for the argument that Olsen Industries discussed credit bidding with FINOVA prior to the parties' execution of the Letter Agreement.

## IX. *The Sale Notice and The Notice of Enforcement*

43. Section 8(c) of the Letter Agreement required FINOVA to formally notice the Foreclosure Sale. (DTE 70 § 8(c).) Olsen Industries consented to this provision with the understanding that such notice was necessary to effect the Foreclosure Sale under the UCC. (Champagne Test. (9/12) p. 98 line 5—p. 99 line 2.) According to Olsen Industries, it only wanted to participate in a sale which promised that the acquirer would be protected from any pre-existing claims related to the Assets. (*Id.* at p. 254 line 23—p. 255 line 25; Champagne Test. (9/13) p. 34 line 23—p. 35 line 10.)

44. Pursuant to the Letter Agreement, Levy drafted a notice of the Foreclosure Sale (the "Sale Notice") and distributed the Sale Notice to Olsen Industries and its counsel on March 7, 2000, the very same day that the Letter Agreement was executed. (Levy Test. (9/13) p. 125 lines 13–24.) The Sale Notice stated that the Foreclosure Sale was scheduled for March 21, 2000 and specified, as required by the UCC, the bidding terms which would be followed by the secured lender at the Foreclosure Sale (the "Bid Procedures"). (DTE 81.) Levy distributed additional drafts of the Sale Notice to (among others) Calton, Pointer and Champagne on March 7, 9 and 13, 2000. (DTE 72–73, 76–77, 81.)

45. Pointer, Champagne and Calton received the drafts of the Sale Notice circulated by Levy on March 7, 9, and 13, 2000. (DTE 72–73, 76–77, 81; Pointer Test. (9/11) p. 59 lines 22–25, p. 72 line 23—p. 73 line 5, p. 73 line 19—p. 74 line 7.) The draft Sale Notice provided that "Secured Party may credit bid all or a portion of its debt at the sale." (DTE 73.) This language, drafted substantially contemporaneously with the Letter Agreement *and* FINOVA's negotiations to sell its Consolidated debt to Allstyle (*see* ¶ 49 *infra*) is convincing evidence of the parties' understanding and intent at the time.

46. Olsen Industries did not object to the draft Sale Notice or Bid Procedures. Indeed, Champagne and Pointer both testified that they did not send any writing to FINOVA which expressed any objection to either the Sale Notice or the Bid Procedures. (Champagne Test. (9/13) p. 9 line 20—p. 10 line 3, p. 11 lines 19–24.) Calton did not recall taking any action with regard to either the Sale Notice or Bid Procedures. (Calton Test. (9/13) p. 232 line 19—p. 233 line 2, p. 236 line 7—p. 237 line 14.) Neither Levy nor Herron received any objection from Olsen Industries regarding the Sale Notice or Bid Procedures. (Levy Test. (9/13) p. 133 line 6–p. 134 line 15; Herron Test. (9/13) p. 79 lines 12–20.) In short, there is no admissible evidence that Olsen Industries did anything other than accept the Sale Notice's express disclosure that the secured party's right to credit bid at the Foreclosure Sale remained unfettered.

47. The Letter Agreement also required FINOVA to deliver a notice of termination of the automatic stay within one business day of execution of the Letter Agreement. (DTE 70 § 7.) On March 8, 2000, FINOVA filed a notice of enforcement (the "Notice of Enforcement") with the Indiana Bankruptcy Court invoking its

right to terminate the automatic stay. (DTE 75.) A copy of the Sale Notice was attached as Exhibit A to the Notice of Enforcement. (*Id.*) In accordance with the terms of the financing order, the Notice of Enforcement became effective on March 13, 2000. (*Id.*)

48. On March 14, 2000, FINOVA published the Sale Notice and served the Sale Notice pursuant to section 8(c) of the Letter Agreement. (DTE 81.)

## X. *The Loan Purchase Agreement*

49. On March 7, 2000, consistent with FINOVA's preference to sell its debt, Levy, on behalf of FINOVA, renewed discussions with Allstyle regarding Allstyle's interest in purchasing FINOVA's Consolidated's debt. (DTE 71; Levy Test. (9/13) p. 136 lines 1–24; Carlberg Test. (9/14) p. 16 line 11—p. 17 line 22.) FINOVA's continuing discussions with Allstyle were contemporaneous with FINOVA's negotiation and execution of the Letter Agreement. (Levy Test. (9/13) p. 136 lines 1–24.) Indeed, they renewed on the very day that FINOVA executed the Letter Agreement and sent Olsen Industries the draft Sale Notice. (Herron Test. (9/13) p. 82 lines 5–18.)

50. Levy testified that he would not have entered into negotiations to sell FINOVA's Consolidated debt to Allstyle had he believed that, the very same day, his client had signed away its right to credit bid. (Levy Test. (9/13) p. 136 line 15—p. 138 line 14.) Herron likewise testified that he would not have pursued the sale of FINOVA's debt to Allstyle if FINOVA had restricted its right to credit bid at the Foreclosure Sale or sell its Consolidated debt by the Letter Agreement. (Herron Test. (9/13) p. 52 line 21—p. 53 line 12.)

51. As between simply appearing at the Foreclosure Sale or purchasing FINOVA's Consolidated debt, Allstyle indicated that it preferred to purchase the Consolidated debt. (Magee Test. (9/14) p. 52 line 5—p. 54 line 11; Carlberg Test. (9/14) p. 20 lines 3–9.) Allstyle and its counsel believed that benefits of purchasing the Consolidated debt included (among other things) (i) preventing FINOVA from appearing and exercising its right to credit bid at the Foreclosure Sale and (ii) obtaining the rights as the secured party to credit bid at the Foreclosure Sale. (Magee Test. (9/14) p. 52 line 20—p. 53 line 3; Carlberg Test. (9/14) p. 20 lines 13–24.)

52. In short, Allstyle's interest in acquiring FINOVA's debt was a means of enhancing its ability to acquire the Assets at the Foreclosure Sale. (Carlberg Test. (9/14) p. 20 lines 10–24; Herron Test. (9/13) p. 52 lines 18–20; Levy Test. (9/13) p. 137 lines 10–18.) Indeed, in accordance with its intention to acquire the Assets, on March 14, 2000, prior to finalizing any agreement to purchase FINOVA's Consolidated debt, Allstyle sent FINOVA's counsel written notification of its intent to bid at the March 21, 2000 Foreclosure Sale. (DTE 84.) Allstyle also delivered an earnest money deposit in the form of a $250,000 cashier's check the day prior to the Foreclosure Sale. (DTE 85; Herron Test. (9/13) p. 56 lines 2–22.) [4]

53. Allstyle always intended to consummate the purchase of FINOVA's Consolidated debt and the Consolidated Assets through a specially-formed entity. (Magee Test. (9/14) p. 34 lines 15–22.) FINOVA

---

4. To be a "qualified bidder" for the Assets, the Letter Agreement required only that a bidder "(i) submit to FINOVA's counsel, one day before the public foreclosure sale, a written notice of intent to bid, and (ii) submit to FINOVA's counsel, in immediately available funds, an earnest money deposit in the amount of $250,000, prior to the commencement of the public foreclosure sale." (DTE 70 § 8(a)(v).)

also understood that Allstyle intended to use a special purpose entity with respect to the parties' contemplated transactions. (Levy Test. (9/13) p. 170 line 5—p. 175 line 4.)

54. Shortly prior to the Foreclosure Sale, and prior to entering into an agreement with FINOVA to purchase FINOVA's debt, Allstyle formed Martindale Ventures, LLC ("Martindale") as a special purpose entity to acquire the Consolidated debt and the Consolidated Assets. (Magee Test. (9/14) p. 34 lines 15–22.) Martindale was an affiliate of Allstyle. (*Id.* at p. 34–35.) Olsen Industries agrees that Martindale was an affiliate of Allstyle. (Trial Tr. (9/13) p. 172 line 20—p. 173 line 3.) Indeed, Magee testified in response to Olsen Industries' subpoenas to each of Allstyle, Martindale and Texas Furnace LLC ("Texas Furnace"), another entity affiliated with Allstyle. (Magee Test. (9/14) p. 34 lines 1–11, p. 39 lines 16–21; DTE 139–141.) The Court holds that it is immaterial and irrelevant that the earnest money deposit and the notice of intent came from Allstyle, while Martindale was the eventual purchaser of the Consolidated debt and bidder at the Foreclosure Sale.

55. Allstyle and Martindale were represented by their own counsel. (Carlberg Test. (9/14) p. 16 line 7–9, p. 17 line 5—p. 18 line 3.) Martindale and its counsel were provided with the Letter Agreement at an early stage in the parties' negotiations. (Carlberg Test. (9/14) p. 19 lines 1–13.) Counsel for Allstyle and Martindale, an experienced insolvency lawyer, reviewed each of the Letter Agreement, Sale Notice and related documents and, in light of FINOVA's right to credit bid and the absence of any provision restricting FINOVA's rights, independently concluded that the Letter Agreement did not restrict FINOVA's right to credit bid or sell its debt. (Magee Test. (9/14) p. 73 lines 6–15; Carl-

berg Test. (9/14) p. 27 lines 6–19.) Consistent with FINOVA's testimony, Martindale and its counsel confirmed that FINOVA never expressed a concern to them that the Letter Agreement affected either FINOVA's right to credit bid at the Foreclosure Sale or to sell its underlying Consolidated debt. (Magee Test. (9/14) p. 73 lines 6–15; Carlberg Test. (9/14) p. 22 line 2, p. 23 line 17.)

56. On March 21, 2000, prior to the Foreclosure Sale, FINOVA and Martindale entered into a Loan Purchase Agreement and Assignment (the "Loan Purchase Agreement"), whereby Martindale agreed to purchase FINOVA's right, title and interest under the loan documents for $3.225 million. (DTE 91.) Under the loan documents, this included FINOVA's right to credit bid at the Foreclosure Sale. (*Id.*)

57. FINOVA represented in section 7(m) of the Loan Purchase Agreement that "[Martindale] shall have the right to credit bid all or any portion of the Loans at the Foreclosure Sale." (*Id.* at § 7(m).) Herron testified that FINOVA would not have made any representation regarding FINOVA or its successor's right to credit bid at the Foreclosure Sale if the Letter Agreement had expressly or impliedly restricted FINOVA's right to credit bid at the Foreclosure Sale. (Herron Test. (9/13) p. 52 line 18—p. 53 line 12.) Further, FINOVA did not believe that the Letter Agreement did restrict FINOVA's right either to sell its Consolidated debt or restrict FINOVA's (or its successor's) right to credit bid at the Foreclosure Sale. (*Id.* at p. 47 line 24–p. 48 line 8; Levy Test. (9/13) p. 124 lines 12–15.) Martindale confirmed that this written representation was only requested out of an abundance of caution and that the parties did not believe that FINOVA's or its successor's rights to credit bid were affected by the Letter Agreement. (Carl-

berg Test. (9/14) p. 24 line 13—p. 25 line 10, p. 27 lines 6–19.)

## XI. *The Foreclosure Sale*

58. As required by the Sale Notice, the Foreclosure Sale was conducted at the offices of FINOVA's counsel on March 21, 2000. (DTE 81; Herron Test. (9/13) p. 56 lines 23–24.) At the commencement of the Foreclosure Sale, FINOVA announced that it had sold its debt to Martindale and that Martindale's counsel would conduct the auction. (Levy Test. (9/13) p. 144 lines 1–8; Herron Test. (9/13) p. 57 lines 9–13; Magee Test. (9/14) p. 74 lines 12–16.)

59. Martindale's counsel then announced that the Collateral would be sold in two lots: (i) Lot 1: the Assets identified in the Letter Agreement; and (ii) Lot 2: the remaining assets of Consolidated constituting Collateral (the "Remaining Assets"). (Herron Test. (9/13) p. 57 lines 14–22; Carlberg Test. (9/14) p. 27 lines 20–22; Pointer Test. (9/12) p. 106 lines 6–8.) With regard to the Assets (Lot 1), Olsen Industries stated that it stood behind its opening bid of $2.5 million as set forth in the Letter Agreement. (Levy Test. (9/13) p. 177 line 13–p. 179 line 11; Herron Test. (9/13) p. 96 lines 22–23, p. 97 lines 7–19.) Martindale then credit bid $2.625 million for the Assets, the minimum overbid required by the Bid Procedures. (Magee Test. (9/14) p. 74 lines 20–22; Pointer Test. (9/12) p. 106 lines 12–18.) Olsen Industries admits that Martindale's $2.625 million bid, at least in terms of amount, was an adequate and superior bid to its opening bid under the Letter Agreement. (Pointer Test. (9/11) p. 76 lines 3–7; Pointer Test. (9/12) p. 106 lines 12–18.)

60. After Martindale credit bid, Olsen Industries questioned Martindale's right to credit bid. After discussion, Martindale converted its $2.625 million credit bid to a $2.625 million cash bid for the Assets. (Herron Test. (9/13) p. 58 lines 12–18; Magee Test. (9/14) p. 74 line 20–p. 75 line 2; Levy Test. (9/13) p. 144 line 20–p. 145 line 7; Pointer Test. (9/12) p. 106 lines 19–25.) Olsen Industries admits that Martindale stated at the Foreclosure Sale that it was converting its $2.625 million credit bid to a $2.625 million cash bid. (Response of Creditor Olsen Industries Inc. to Debtors' Omnibus Objection to Claims, Dkt. No. 1106 ¶ 10.) (admitting that Martindale's bid was "termed a 'cash bid' "); (Pointer Test. (9/11) p. 76 lines 21–25; Champagne Test. (9/13) p. 15 lines 12–19.)

61. After Martindale converted its $2.625 million credit bid to a $2.625 million cash bid, Olsen Industries was given the opportunity to bid against Martindale's $2.625 million cash bid. (Pointer Test. (9/11) p. 77 lines 3–5; Pointer Test. (9/12) p. 107 lines 1–7.) Olsen Industries expressly declined to increase its opening bid of $2.5 million under the Letter Agreement and Martindale's $2.625 million cash bid was deemed the highest and best bid made at the Foreclosure Sale for the Assets. (Pointer Test. (9/11) p. 77 lines 3–5; Pointer Test. (9/12) p. 107 lines 5–12; Champagne Test. (9/13) p. 15 lines 21–24; Carlberg Test. (9/14) p. 29 lines 1–5.)

## XII. *The Closing*

62. On March 22, 2000, Martindale, as the successful bidder at the auction, closed on the Assets and then sold those Assets to Texas Furnace, L.L.C. ("Texas Furnace"), an entity affiliated with Allstyle and Martindale. (Carlberg Test. (9/14) p. 30 lines 1–24; Magee Test. (9/14) p. 78 line 13—p. 79 line 1.) The two closings were completed contemporaneously and by cash transfer. (Carlberg Test. (9/14) p. 30 lines 1–24; Magee Test. (9/14) p. 78 line 13—p. 79 line 24.)

63. The cash transfer was made by cashier's check. The cashier's check was

issued by Fredonia State Bank to Texas Furnace and remitted to Martindale, in its capacity as successful bidder at the foreclosure sale. (Magee Test. (9/14) p. 80 lines 6–13; DTE 96.) That check was then transferred by Martindale, in its capacity as successful bidder at the foreclosure sale, to Martindale, in its capacity as secured lender and seller the Foreclosure Sale. (Magee Test. (9/14) p. 83 lines 18–25; Carlberg Test. (9/14) p. 30 lines 1–24.) The cashier's check was deposited into Martindale's account at Fredonia State Bank on March 22, 2000. (Magee Test. (9/14) p. 80 lines 18–25; DTE 97.)

64. To the extent that any of the foregoing Findings of Fact are more properly characterized as a Conclusion of Law, the Court deems each such Finding of Fact a Conclusion of Law just as if it were fully set forth in the Court's Conclusions of Law.

## CONCLUSIONS OF LAW

### I. Burden of Proof

■ 1. The burden of proof with respect to a proof of claim filed under section 502(a) of the Bankruptcy Code rests on different parties at different times. Initially, the party filing the claim must allege facts sufficient to support a legal basis for the claim. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). Provided that the claimant can satisfy this standard, the claim is *prima facie* valid pursuant to Rule 3001(f) of the Federal Rules of Bankruptcy Procedure. *See id.* The burden then shifts to the objecting party to produce evidence sufficient to negate the *prima facie* validity of the claim. *See In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50 (Bankr.D.Del.2001). "If the objecting party overcomes the prima facie validity of the claim, then the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *Id.* (quoting *Smith*

*v. Sprayberry Square Holdings, Inc. (In re Smith)*, 249 B.R. 328, 332–33 (Bankr. S.D.Ga.2000)).

■ 2. Even if the Claim, which is scant on supporting documentation, were sufficient of itself to satisfy Olsen Industries' burden to demonstrate a *prima facie* case, FINOVA has adduced sufficient evidence to shift back to Olsen Industries the burden of proof with respect to the Claim. The amount of evidence which a debtor is required to submit in order to shift the burden back to a claimant is slight. Indeed, the objecting party need only introduce the equivalent amount of admissible evidence sufficient to defeat a motion for summary judgment. *See* Patrick A. Jackson, *Conceptualizing Claim Objections (Part I: The Fed.R.Civ.P. 56 Analogy )*, ABI JOURNAL, Vol. XXV, No. 5, p. 42 (June 2006); Patrick A. Jackson, *Conceptualizing Claim Objections (Part II: "Books and Records" Revisited)*, ABI Journal, Vol. XXV, No. 6, p. 42 (July/August 2006).

3. Even though it is questionable here whether Olsen Industries' claim satisfied its initial burden to demonstrate a *prima facie* case, FINOVA presented sufficient evidence at trial, as further described below, to rebut any *prima facie* showing Olsen Industries may have made by its Claim. Accordingly, Olsen Industries bears the ultimate burden of proof with respect to its Claim.

### II. Relevant Law

4. The Letter Agreement provides that it is to be interpreted under the law of Ontario, Canada. Thus, the Court holds that, to the extent legal principles are necessary to interpret the Letter Agreement, it will apply Ontario law. However, the Letter Agreement also specifically provides that UCC § 9–504—which obviously cannot refer to the laws of a province of

Canada—governs the Foreclosure Sale and related proceedings for the sale of the Assets contemplated by the Letter Agreement. (DTE 70 § 8(b)(ii).) Other evidence also clearly demonstrates that the parties intended the UCC to apply to the sale of the Assets. For example, Olsen Industries only wanted the opportunity to purchase the Assets with the benefit of the shield to successor liability provided by the UCC. (Champagne Test. (9/12) p. 255 lines 20–25.) Thus, where the issue turns on the rights of parties at the Foreclosure Sale or the foreclosure process, Indiana's UCC law governs.

5. Additionally, as a general matter, the provisions of the Bankruptcy Code also apply in this proceeding as they would in any other claim proceeding before this Court. Here, they further inform the Court as the Foreclosure Sale occurred pursuant to orders of the Indiana Bankruptcy Court and in connection with FINOVA's status as a secured lender to Consolidated, a debtor-in-possession. (DTE 70 p. 1, Introductory paragraph.) Accordingly, although the Court may apply Ontario law to the Letter Agreement, Ontario law is not the only source of law which the Court may consider and apply.

6. However, to start its analysis, the Court considers certain principles of Ontario law relevant to the Letter Agreement, which Olsen Industries claims FINOVA breached.

7. Under Ontario law, "[a] court should interpret a plainly worded document by presuming that the parties intended the legal consequences of their words." *Canadian Premier Hldgs. Ltd. v. Winterthur Canada Fin. Corp.*, 132 O.A.C. 172, 2000 O.A.C. Lexis 331, *10 (Ont.Ct.App. May 11, 2000). Further, "[i]t is trite law that 'It is unnecessary to consider any extrinsic evidence at all where the documents are clear and unambiguous

on their face.'" *I.M.P. Group Ltd. v. Compaq Fin. Servs. Corp.*, [2006] O.J. No. 2994, 2006 On.C. Lexis 2907, *9–10 (Ont.Sup.Ct. July 24, 2006); *Takhar Investments Inc. v. Household Fin. Corp.*, 2005 WL 434723, 2005 CarswellOnt 823 ¶¶ 24–26 (Ont.S.C.J. Mar. 4, 2005) (stating that where a contract is unambiguous, extrinsic evidence regarding the meaning of the contract will not be admitted).

### III. *FINOVA Did Not Breach Its Obligations Under the Letter Agreement*

8. Olsen Industries makes two central arguments: (i) the Letter Agreement did not give FINOVA the right to credit bid at the Foreclosure Sale or to sell its underlying Consolidated debt prior to the Foreclosure Sale; and (ii) the Letter Agreement required a cash bid, and the successful bid submitted by Martindale at the Foreclosure Sale was a credit bid. (DTE 114.) Neither of these arguments is supported by either the plain language of the Letter Agreement or admissible evidence.

#### (1) *The Letter Agreement Does Not Prohibit FINOVA to Credit Bid or to Sell Its Consolidated Debt*

9. The Letter Agreement required the Assets to be sold at a public foreclosure sale conducted under section 9–504 of the UCC. Under section 9–504 of the UCC, as adopted by the state of Indiana at the time, a "secured party may buy at any public sale." *See* IND. CODE ANN. § 26–1–9–504 (2000). Although section 9–504 falls short of granting secured creditors a right to credit bid, it does grant them a right to "buy" without limiting the form of acceptable payment. Given that the statute allows secured creditors to buy and neither the statute nor the Letter Agreement prohibit credit bidding, it would be overly-formalistic to prohibit

credit bidding in this situation. As the proceeds of a sale under section 9–504 are used to pay the debt owed to the secured creditor, it is ultimately inconsequential whether a secured creditor pays with cash or with the reduction of debt. The end result is the same.

10. The Letter Agreement is completely silent on the issue of FINOVA's right to credit bid at the Foreclosure Sale; indeed, the Letter Agreement does not even contain the term "credit bid." Similarly, the Letter Agreement is silent as to any restriction on FINOVA's right to sell its Consolidated debt. The Letter Agreement, by its silence, is the best indicator to the Court that it was not intended to take away FINOVA's right to credit bid or sell its Consolidated debt.

11. Olsen Industries argues that section 8(a)(ii) of the Letter Agreement provides support for its argument that FINOVA intended to waive its right to credit bid at the Foreclosure Sale. Section 8(a)(ii) of the Letter Agreement provides that "the determination of the highest and best bid shall be based upon the net cash proceeds to be received by FINOVA after payment of the break-up fee, if applicable." (DTE 70 § 8(a)(ii).) According to Olsen Industries, the language "net cash proceeds" provides a basis for the Court to find that FINOVA did not have a right to credit bid.

12. The Court disagrees. Notably, Olsen Industries never explains why it failed to simply say (for example) "FINOVA waives its right to credit bid" in the Letter Agreement, a document which its counsel helped draft. Olsen Industries was represented by experienced counsel who knew or should have known how to clearly and unambiguously reflect the waiver of a

right.[5] Moreover, given Herron's repeated statements to Champagne that Herron intended to retain FINOVA's right to credit bid at the Foreclosure Sale or to sell its Consolidated debt, (Herron Test. (9/13) p. 46 line 21—p. 47 line 5, p. 101 line 15—p. 102 line 19), Olsen Industries had every incentive to insert clear language eliminating the right. Olsen Industries can provide no explanation sufficient to justify this basic deficiency in its Claim.

13. Moreover, there is ample and, the Court finds, convincing evidence of "contrary intention" by FINOVA with respect to whether section 8(a)(ii) was intended to address FINOVA's right to credit bid at the Foreclosure Sale. Levy clearly did not believe that section 8(a)(ii) addressed FINOVA's right to credit bid. Instead, Levy credibly explained that he understood section 8(a)(ii) and its language regarding "net cash proceeds" to refer to (i) the inclusion of the Letter Agreement's $100,000 break-up fee to Olsen Industries' opening bid for purposes of determining the winning bid and (ii) non-cash components of a bid which would not benefit the secured lender. (Levy Test. (9/13) p. 130 line 2—p. 131 line 2.) As noted by Levy, the parties did not discuss the meaning of section 8(a)(ii) and it was not a negotiated provision of the Letter Agreement. (*Id.* at p. 131 lines 3–7; PTE 23–24, 26, 28–29.)

14. Further, Levy testified to his understanding that a secured lender's "credit bid" is the functional equivalent of a "cash" bid, at least as regards to the secured lender; the credit bid merely saves a step of payment by the lender, as buyer, to the lender, as seller, and thus acts as a convenience. (Levy Test. (9/13) p. 131 line 11—p. 132 line 4.) He also noted that the

---

**5.** Calton testified that she viewed herself as having expertise in the area of "bankruptcy and bankruptcy related issues, insolvency related issues". (Calton Test. (9/13) p. 191 line 23—p. 192 line 1.) She stated that she represented a purchaser of assets either in or out of bankruptcy "roughly a dozen" times. (Calton Test. (9/13) p. 193 line 11–13.)

secured party remains liable to make additional payment to the estate for its bid if the secured claim is later deemed infirm or otherwise subordinated. (*Id.* at p. 131 line 23—p. 132 line 4.) Levy's testimony is consistent with relevant authority and is credited by this Court. *See, e.g., Cohen v. KB Mezzanine Fund II, (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir.2006) ("Because the Lenders had a valid security interest in essentially all the assets sold, by definition they were entitled to the satisfaction of their claims from available proceeds of any sale of those underlying assets. Their credit bid did nothing more than preserve their right to the proceeds, as credit bids do under § 363(k)."); *Altus Bank v. State Farm Fire and Casualty Co.*, No. 91–55329, 1992 WL 341321, at *1, 1992 U.S.App. Lexis 31899, at *2 (9th Cir. Nov.19, 1992) ("the result of Altus Bank's full-credit bid is no different than if Altus had tendered cash to purchase the mortgaged property, or than if some other purchaser had bought the property at the foreclosure sale for the same amount of money.").

15. Moreover, Olsen Industries never told Levy or Herron that Olsen Industries intended section 8(a)(ii) to do more than it actually says, by restricting FINOVA's right to credit bid. (Levy Test. (9/13) p. 131 lines 3–7.) All of these facts fully support the Court's conclusion that section 8(a)(ii) of the Letter Agreement did not affect FINOVA's right to credit bid at the Foreclosure Sale.

■ 16. In any event, the Court cannot accept Olsen Industries' interpretation for the additional reason that it would cause the Court to construe the terms of the Letter Agreement in an inconsistent manner. As noted above, section 8(a)(v) of the Letter Agreement provides that:

> [I]n order for any other bidder to be a qualified bidder for the Assets, it must (i) submit to FINOVA's counsel, one day before the public foreclosure sale, a written notice of intent to bid, and (ii) submit to FINOVA's counsel, in immediately available funds, an earnest money deposit in the amount of $250,000, prior to the commencement of the public foreclosure auction.

(DTE 70 § 8(a)(v).) There is nothing in section 8(a)(v) of the Letter Agreement that prohibits a credit bid from being a "qualified bid." Indeed, Levy deleted Olsen Industries' earlier language seeking to impose such a limitation. Accordingly, Olsen Industries' argument, if accepted by this Court, would construe the Letter Agreement as providing both that a party submitting a credit bid could be deemed a "qualified bidder" pursuant to section 8(a)(v), but that same party never could be the "successful bidder" under section 8(a)(ii) of the Letter Agreement. The Court is not required to, and should not, countenance an interpretation of an agreement which lends to inconsistent provisions. *See Hillis Oil & Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57, at 66, 1986 CarswellNS 147 (Can. Feb. 28, 1986) (noting that various clauses are not to be considered in isolation, but must be given an interpretation that takes the entire agreement into account); *Canadian Newspapers Co. Ltd. v. Kansa General Ins. Co.*, [1996] 30 O.R. (3d) 257 (C.A.), at 270, 1996 CarswellOnt 3227 (Ont.Ct.App. Sept. 11, 1996) (same).

17. The Letter Agreement provides in section 8(c): "FINOVA agrees to publish notice of the public foreclosure sale . . . ." As drafted by Levy, that notice provides that the "Secured Party may credit bid all or a portion of its debt at the sale." The Sale Notice, which FINOVA distributed in fulfillment of the section 8(c), was explicitly made part of the understanding reached in the Letter Agreement so that if Olsen

Industries believed that the Sale Notice was in conflict with its understanding of the Letter Agreement, Olsen Industries had a choice to either (a) accept the terms of the Sale Notice or (b) object to its terms. By its silence, Olsen Industries accepted this provision of the Sale Notice as part of the deal. Accordingly, for these reasons as well, the Court rejects Olsen Industries' argument.

18. Pointer testified that while he did not object in writing to any of the provisions of the Sale Notice, he did call Calton to talk about objections to the Sale Notice on either March 8 or 9. (Pointer Test. (9/11) p. 64 line 1—p. 65 line 17.) However, Calton does not recall ever making Olsen Industries' objection to the Sale Notice known to anyone from FINOVA. (Calton Test. (9/13) p. 232 line 19—p. 233 line 4; p. 234 lines 6–9; p. 238 lines 7–21.) Levy similarly has no recollection of any conversation with anyone from Olsen Industries regarding Olsen Industries' objection to FINOVA's right to credit bid. (Levy Test. (9/13) p. 125 line 13—p. 126 line 17.) It is inconceivable that Pointer and Calton did not understand the implication of the credit bid provision of the Sale Notice and yet they failed to communicate any objection to anyone at FINOVA. They simply did not challenge this provision as being in conflict with the Letter Agreement. It was not until Martindale presented a higher bid at the Foreclosure Sale that they raised the issue. Olsen's conduct of silence up to that point is clearly in conflict with the position it now takes.

## (2) *Extrinsic Evidence Does Not Support Olsen Industries' Argument*

19. Even if the Court were to find that the Letter Agreement was not clear with respect to FINOVA's right to credit bid, the Court would still find against Olsen Industries because the admissible extrinsic evidence contradicts Olsen Industries' argument that FINOVA expressly or impliedly waived its right to credit bid or sell its Consolidated debt.

20. First, neither Herron nor Levy intended to waive FINOVA's right to credit bid nor believed that the Letter Agreement affected FINOVA's right to credit bid. Indeed, on March 7, 2000, the very date that the Letter Agreement was executed, Levy distributed the Sale Notice— which expressly stated that FINOVA preserved its right to credit bid at the Foreclosure Sale—to Olsen Industries and its counsel. Moreover, that very day as well, FINOVA renewed its discussions with Martindale regarding Martindale's interest in purchasing the Consolidated debt. Neither Herron nor Levy would have been discussing the concept of a sale of the Consolidated debt to Martindale if they had believed that FINOVA had waived either its right to credit bid or sell its Consolidated debt. Further, FINOVA understood that Martindale intended to buy the Consolidated debt so that it could credit bid at the Foreclosure Sale and that this was the entire basis for Martindale's continuing discussions with FINOVA. Accordingly, on March 7, 2000, the very day the Letter Agreement was executed, FINOVA engaged in multiple actions which clearly reflect FINOVA's understanding that it did not waive its right to credit bid or sell the debt.

21. Later, FINOVA represented and warranted to Martindale (as is customary in purchase agreements of this sort) that Martindale was entitled to credit bid at the Foreclosure Sale if it purchased the Consolidated debt. Levy and Herron would not have made this representation if they had any doubt about FINOVA's right to credit bid at the Foreclosure Sale. Further, as confirmed by Carlberg, Martindale

did not ask FINOVA to make the representation regarding its right to credit bid because Martindale doubted FINOVA's right to credit bid. Instead, Martindale's owners were simply being cautions, and there was no discussion between FINOVA and Martindale regarding the merits of this representation.

22. FINOVA also published the Sale Notice, as required by the Letter Agreement and the UCC, after Olsen Industries received it and did not object to its terms. The credible testimony confirms that the terms of the Sale Notice were not intended to vary the terms of the Letter Agreement but were believed consistent with the terms relevant to the Foreclosure Sale as reflected in the Letter Agreement (Levy Test. (9/13) p. 134 lines 4–7.)

23. Levy testified, and was not rebutted,[6] that he intended to excise *any* provision of the draft Letter Agreement which may have affected FINOVA's right to credit bid or sell the debt. (*Id.* at p. 127 lines 4–8.) The Court gives credence to Levy's testimony. *See Canadian Premier Hldgs. Ltd. v. Winterthur Canada Fin. Corp.,* 132 O.A.C. 172, 2000 O.A.C. Lexis 331, *14 (Ont.Ct.App. May 11, 2000) ("[I]t seems to me, however, that what CompCorp had done or not done was immaterial. What mattered was what was in the minds of the negotiators. Counsel for the respondents was obviously concerned about retroactive assessments and his concern was reflected in the final wording of s. 4.2. The negotiations that led to the agreement therefore confirm that the respondents were to be responsible for the CompCorp assessments in issue on this appeal.").

24. In short, Olsen Industries, whose counsel did the first draft of the Letter Agreement, could have easily drafted a

clear restriction on FINOVA's right to credit bid at the Foreclosure Sale or to sell the underlying debt. Herron's statements to Champagne placed Olsen Industries on direct notice of its potential interest in (or need to) have such right. But neither the plain language of the Letter Agreement nor the admissible extrinsic evidence support Olsen Industries' argument that the Letter Agreement actually restricted, or was intended by the parties to actually restrict, FINOVA's rights. Under these circumstances, the Court cannot find that FINOVA waived its right to credit bid at the Foreclosure Sale or its right to sell the Consolidated debt. *See Armenia Rugs—Tapis Ltd. v. Axor Constr. Canada Inc.,* 2006 On.C. Lexis 986, *10 (Ont.Sup.Ct. Mar. 20, 2006)(claimant was responsible for its own failure to modify contractual language to meet its interest: "Armenia could and should have amended the terms of the Appendix F affidavit before the contract was signed, if it did not agree with the wording in Appendix F").

### (3) *The Court Cannot Imply Terms into The Letter Agreement*

25. Olsen Industries also boldly asks the Court to imply a contract provision waiving FINOVA's right to credit bid or sell the Consolidated debt—i.e. to reform the contract which it participated in drafting to include a provision which is nowhere in it. Olsen Industries' argument conflicts with basic principles of contract interpretation.

26. As noted by the Ontario Court of Appeals, "[t]he cardinal rule of contract interpretation 'is that the court should give effect to the intention of the parties as expressed in their written agreement', and where the intention of the

---

**6.** As noted above, Olsen Industries' counsel could not recall *any* of the circumstances surrounding the negotiation and execution of the Letter Agreement.

parties 'is plainly expressed in the language of the agreement, the court should not stray beyond the four corners of the agreement.'" *Venture Capital USA Inc. v. Yorkton Secs. Inc.*, [2005] O.J. No. 1885, 2005 On.C. Lexis 2094, *17 (Ont.Ct.App. May 13, 2005) (quoting *KPMG Inc. v. Canadian Imperial Bank of Commerce*, 1998 A.C.W.S.J. Lexis 91681, ¶ 5 (Ont.Ct.App. Nov. 16, 1998)); *see also Macourtice Develps. Inc. v. Clarington*, [2005] O.J. No. 5367, 2005 On.C. Lexis 6603, *12–13 (Ont.Sup.Ct. Dec. 14, 2005).

■■■ 27. The guidelines for implying a contractual term are onerous. As recently discussed by the Ontario Court of Appeals:

> When implying a term ... courts must be careful to do so based on actual evidence and not mere judicial discretion.... 'What is important in both formulations is a focus on the intentions of the actual parties. A court, when dealing with terms implied in fact, must be careful not to slide into determining the intentions of reasonable parties. This is why the implication of the term must have a certain degree of obviousness to it, *and why, if there is evidence of a contrary intention, on the part of either party, an implied term may not be found on this basis.*'

*Venture Capital USA Inc. v. Yorkton Secs. Inc.*, 2005 On.C. Lexis 2094, at *20–21 (internal citation omitted) (emphasis added); *see also Macourtice Develps. Inc. v. Clarington*, 2005 On.C. Lexis 6603, at *27–28 ("When implying a term, the court should do so on evidence of the intentions of the actual parties, and not just the intentions of reasonable parties. If there is evidence of a contrary intention, on the part of either party, an implied term may not be found."); *Silber v. DDJ Canadian High Yield Fund*, [2006] O.J. No. 2503, 2006 On.C. Lexis 2440, *5–6 (Ont. Sup.Ct.

June 19, 2006) (noting that the Supreme Court of Canada has found that the implied term "must be so obvious that 'it goes without saying.'").

28. Here, there is substantial contemporaneous evidence which unquestionably demonstrates that at the time of the parties' execution of the Letter Agreement FINOVA rightly did not believe that the Letter Agreement restricted FINOVA's right to credit bid at the Foreclosure Sale or sell its Consolidated debt. As Olsen Industries has not overcome FINOVA's credible evidence regarding its "contrary intention" regarding a waiver of its right to credit bid or sell the debt, the Court declines Olsen Industries' invitation to imply such terms into the parties' Letter Agreement.

## IV. *Martindale Submitted a Cash Bid*

■■■ 29. Even if FINOVA did not have the right to credit bid under the Letter Agreement, Olsen Industries' Claim still would fail because Martindale's successful bid at the Foreclosure Sale was effectively a cash bid.

30. As described in the Findings of Fact set forth above, Martindale converted its credit bid to a cash bid after Olsen Industries questioned Martindale's right to credit bid at the Foreclosure Sale. Olsen Industries does not dispute that Martindale stated at the Foreclosure Sale that its $2.625 million bid was a cash bid and that the amount of $2.625 million was a qualifying higher offer under the Letter Agreement. Olsen Industries' only argument is that the bid was cash in name only. However, the admissible evidence demonstrates that Martindale actually received a cash payment and closed the purchase of the Assets on a cash basis. Indeed, as described above, Martindale produced a copy of the (i) related bills of sale, (ii)

$2.625 million cash payment (by check) and (iii) deposit slip for the $2.625 million cash payment, all related to Martindale's purchase and subsequent sale of the Assets. (DTE 94–97.) This is a cash bid.

31. Previously, the Court has discussed Allstyle's formation of Martindale as an acquisition subsidiary, the notice of intent to bid at the Foreclosure Sale and the earnest money deposit under the Letter Agreement. Olsen Industries argues that the Court should find that Martindale (which was formed only shortly prior to the Foreclosure Sale) was not a qualified bidder because Allstyle, rather than Martindale, submitted the notice of intent to bid and earnest money deposit. The Court does not agree with Olsen Industries. Instead, based on the facts found above, the Court finds that Martindale was a qualified bidder at the Foreclosure Sale and as required by the Letter Agreement.

### V. *FINOVA Is Liable for the $100,000 Break-up Fee*

██ 32. As set forth above, the Court has found that Olsen Industries' arguments in favor of liability are unfounded. Olsen Industries also argues, in the alternative, that FINOVA, is liable to Olsen Industries for the $100,000 break-up fee set forth in the Letter Agreement. FINOVA, on the other hand, argues that FINOVA bears no liability for the break-up fee because Olsen Industries was not ready, willing or able to consummate the acquisition of the Assets as required by the Letter Agreement.

33. The Court agrees with Olsen Industries that FINOVA is liable for the $100,000 break-up fee because there is insufficient evidence to conclude that Olsen Industries was not "ready, willing and able to consummate the purchase of the Assets" on the date of the sale as required by

section 8(a)(iv) of the Letter Agreement. (DTE 70.)

34. Levy testified that shortly before the sale, counsel for Olsen Industries stated that Olsen Industries was not satisfied that FINOVA had demonstrated that Olsen Industries would have sufficient access to the Consolidated's leased premises beginning on the closing date as required by section 10 of the Letter Agreement. (Levy Test. (9/13) p. 148 lines 8–21.) Levy understood this to mean that if Olsen Industries submitted the highest bid at the Foreclosure Sale it could refuse to close the deal unless FINOVA provided further representations and warranties regarding Olsen Industries' ability to access Consolidated's leased premises. (*Id.* at p. 148 line 22—p. 149 line 1.) Therefore, in Levy's opinion, "Olsen was not ready, willing and able to consummate their offer as evidenced in this March 7th agreement." (*Id.* at p. 149 lines 2–5.)

35. The Court finds the above cited portions of Levy's testimony to be speculative and unconvincing. Although it is evident from the Letter Agreement that Olsen Industries could have avoided closing the deal, it is impossible for Levy to know what Olsen Industries actually would have done had it been the successful bidder. Levy's testimony that Olsen Industries was not ready to stand up to its offer in the Letter Agreement contradicts the testimonies of Herron, Pointer and Carlberg who stated that Olsen Industries came to the sale and affirmed its $2.5 million bid without stating any contingencies to their bid. (Herron Test. (9/13) p. 96 line 22—p. 97 line 24; Pointer Test. (9/12) p. 106 lines 9–11; Carlberg Test. (9/14) p. 27 lines 20–22.) It would be unjust to deprive Olsen Industries of the break-up fee on the sole basis of Levy's recollection of Olsen Industries' counsel's statements shortly before the sale started.

36. Accordingly the Court finds that FINVOA is liable for payment of the $100,000 break-up fee set forth in the Letter Agreement.

### VI. *Credibility of the Parties' Witnesses*

37. To the extent that there has been a conflict in the testimony offered to the Court, the Court has considered the credibility of the various witnesses. In this regard, the Court has found the testimony of Herron, who is no longer employed by FINOVA, and Levy to be credible. The Court also has found the testimony of Magee and Carlberg, both non-parties, credible. The Court further finds rather puzzling Calton's startling lack of memory on important aspects of her role in the transaction.

38. To the extent that any of the foregoing Conclusions of Law are more properly characterized as a Finding of Fact, the Court deems each such Conclusion of Law a Finding of Fact just as if it were fully set forth in the Court's Findings of Fact.

### CONCLUSION

39. In summary, the Court finds that the Letter Agreement did not waive, expressly or impliedly, FINOVA's right to credit bid at the Foreclosure Sale or its right to sell its underlying Consolidated debt prior to the Foreclosure Sale, and FINOVA did not breach the terms of the Letter Agreement by selling its Consolidated debt or by Martindale's initial submission of a credit bid at the Foreclosure Sale. The Court also finds that Martindale was a qualified bidder at the Foreclosure Sale and that Martindale's winning bid at the Foreclosure Sale was a cash bid. The Court further finds that Olsen Industries was presented the opportunity to bid at the Foreclosure Sale and chose not to bid higher than Martindale.

40. Accordingly, on the basis of the foregoing Findings of Fact and Conclusions of Law, this Court finds that FINOVA bears no liability to Olsen Industries on account of the Claim, and therefore that the Claim will be disallowed, except as to the $100,000 break-up fee as to which Olsen Industries will have an allowed claim. There remains the question of Olsen Industries entitlement to interest on the $100,000. The parties should address this issue with further written submissions and submit a proposed form of judgment order for the Court to conclude this matter.