In re PINNACLE BRANDS, INC., Pinnacle Trading Card Company, MLM Acquisition Corp., Donruss Trading Card Company, GSAC Holdings, Inc., and Flapco, Inc., for Debtors.

No. 98–1716 (MFW).

United States Bankruptcy Court, D. Delaware.

Feb. 6, 2001.

**48**

Robert S. Brady, Esquire, Michael R. Nestor, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Mitchel H. Perkiel, Esquire, Benjamin Mintz, Esquire, Kaye Scholer Fierman Hays & Handler, LLP, New York City, Counsel for Debtors.

Jeffrey M. Schlerf, Esquire, Christopher A. Ward, Esquire, the Bayard Firm, Wilmington, DE, Thomas E. Lauria, Esquire, Frank L. Eaton, Esquire, White & Case LLP, Miami, FL, Counsel for Huhtamäki Oy.

Scott D. Cousins, Esquire, Victoria W. Counihan, Esquire, Greenberg Traurig, LLP, Wilmington, DE, Fred S. Hodara, Esquire, Geoffrey T. Raicht, Esquire, Akin Gump Strauss Hauer & Feld, LLP, New York City, Counsel for the Official Committee of Unsecured Creditors.

Jeffrey C. Wisler, Esquire, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Counsel for First Tier Lenders.

Daniel K. Astin, Esquire, Office of the United States Trustee, Philadelphia, PA.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Debtors' Objection to the Administrative Claim of Huhtamäki Oy ("Huhtamäki").[2] Also pending is Huhtamäki's Motion to Strike the Debtors' Objection to its direct claim. For the reasons set forth herein, we deny Huhtamäki's Motion and sustain the Debtors' Objection.

### I. JURISDICTION

This Court has jurisdiction over this matter, which is a core proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(1) and (b)(2)(B).

### II. FACTS

Huhtamäki is the former parent of Leaf, Inc. ("Leaf") which, in turn, is the former parent of Donruss Trading Cards, Inc. ("Donruss"). Prior to 1996, Donruss entered into a licensing agreement with Major League Baseball Properties, Inc. ("MLBP") which allowed Donruss to manufacture and sell baseball cards with the MLBP logo ("the License Agreement"). The License Agreement required Leaf to guarantee all payments due by Donruss.

On April 16, 1996, Pinnacle, Leaf, and Donruss entered into an agreement ("the Asset Purchase Agreement") pursuant to which Pinnacle purchased the name "Donruss," the baseball card assets, and Don-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. The Official Unsecured Creditors' Committee appeared at oral argument and filed a brief in support of the Debtors' Objection.

russ' rights under the License Agreement. Under the Asset Purchase Agreement, Pinnacle also agreed to indemnify, *inter alios*, Huhtamäki for any obligations it might incur under the License Agreement. Huhtamäki subsequently sold Leaf to Hershey Foods Corporation ("Hershey"). As part of its sale of Leaf, Huhtamäki agreed to indemnify Hershey for claims which may arise in connection with the Donruss sale.

After the execution of the Asset Purchase Agreement, Pinnacle became delinquent in its payment obligations to MLBP. By letter dated April 20, 1998, MLBP offered to amend the payment schedule to accommodate Pinnacle's cash flow problems. When Pinnacle was unable to pay under the amended schedule, MLBP purported to terminate the License Agreement on July 21, 1998.

On July 23, 1998, Pinnacle and its affiliates (collectively "the Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code. Subsequent to the filing, the Debtors attempted to sell their inventory, including the baseball card inventory,[3] in the ordinary course of business. MLBP asserted, however, that the License Agreement had been terminated and the Debtors were not entitled to sell the baseball card inventory but were instead obligated to destroy that inventory.

Consequently, on July 30, 1998, the Debtors filed a complaint to enjoin MLBP from interfering with the Debtors' manufacture, distribution or sale of inventory in the ordinary course. The Debtors also filed a motion for a preliminary injunction. For purposes of that motion, the Debtors asserted that, even if the License Agreement had been terminated, they were entitled to sell the existing baseball card inventory. By Order dated August 7, 1998, the Court denied the Debtors' motion for a

preliminary injunction. The Court ordered that the status quo be maintained; namely, the Debtors could not sell the baseball card inventory and MLBP could not take possession of that inventory or require its destruction.

Ultimately, the Debtors and MLBP reached an agreement in which the Debtors were permitted to auction their baseball card inventory, together with their other assets, with the requirement that the successful bidder could not resell any of the baseball card inventory until it obtained a separate license agreement from MLBP. The Debtors agreed to pay MLBP $275,000 for this agreement. Playoff Corporation ("Playoff") was the successful bidder at the auction, agreeing to pay the Debtors approximately $9.6 million for all their assets. Playoff subsequently entered into a separate license agreement with MLBP to permit Playoff to sell a portion of the baseball card inventory and work in process. Huhtamäki did not receive any notice of the auction or the agreements reached among the Debtors, Playoff and MLBP.

Subsequent to the sale, MLBP sued Hershey for the balance due under the License Agreement pursuant to the guarantee given by Leaf. An answer has been filed disputing liability. Huhtamäki is concerned that, if MLBP's suit is successful, it will have an obligation to reimburse Hershey under its indemnification agreement.[4] Huhtamäki asserts an administrative claim in excess of $2.6 million. The Debtors have objected to allowance of the claim and, alternatively, to the priority of the Huhtamäki claim.

### III. *DISCUSSION*

#### A. *Burden of Proof*

Initially, a claimant must allege facts sufficient to support a legal basis for

---

3. The Debtors also manufactured and sold football, basketball, hockey, and other trading cards under agreements similar to its License Agreement with MLBP.

4. We make no finding regarding the merits of any claims or defenses among MLBP, Hershey, and Huhtamäki. For purposes of this Opinion, we assume Huhtamäki has some liability to Hershey/MLBP for which it asserts an indemnification claim against the Debtors.

the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Rule 3001(f) of the Federal Rules of Bankruptcy Procedure. *In re Allegheny International, Inc.,* 954 F.2d 167, 173 (3d Cir.1992). If no party in interest objects to the claim, it is deemed allowed under section 502(a). If an objection is filed, the objecting party bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim. *See Smith v. Sprayberry Square Holdings, Inc. (In re Smith),* 249 B.R. 328, 332–33 (Bankr.S.D.Ga.2000) (citations omitted). "If the objecting party overcomes the prima facie validity of the claim, then the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *Id.*

### B. *Indemnification Claim*

Huhtamäki asserts that it is entitled to an administrative claim based on MLBP's post-petition demand for payment from Hershey (for which Huhtamäki is liable). It asserts that it has a common law right of indemnification from the Debtors which is a post-petition claim, citing *Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.),* 744 F.2d 332 (3d Cir. 1984). Huhtamäki asserts that *Frenville* holds that, under New York law,[5] a common law claim for indemnification does not arise until after the indemnitee (Hershey) has been sued and has answered the complaint. *Id.* at 335. In this case, those events occurred post-petition. Therefore, Huhtamäki asserts that its claim is a post-petition claim. *Id.* at 337.

There are several weaknesses to Huhtamäki's argument. First, Huhtamäki has a contractual indemnification claim. Second, even if Huhtamäki had a post-petition claim, it would not be entitled to administrative status because it did not provide any benefit to the estate.

### 1. *Contractual v. Common Law Indemnification*

In addition to its common law right, Huhtamäki also acknowledges that it has a contractual right to indemnification. Under the Asset Purchase Agreement, Pinnacle agreed to indemnify Huhtamäki if Huhtamäki were required to pay on the MLBP guarantee. In *Frenville,* the Third Circuit distinguished contractual indemnification claims from common law indemnification claims. It held that contractual indemnification claims arise when the contract is executed.

> When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement. . . . Such a surety relationship is the classic case of a contingent right to payment under the Code—the right to payment exists as of the signing of the agreement, but is dependent on the occurrence of a future event.

744 F.2d at 336–37 (citations omitted). *See also In re Mid–American Waste Systems, Inc.,* 228 B.R. 816 (Bankr.D.Del. 1999) (holding that the contractual claims of officers and directors for indemnity arose when the contract was executed and were therefore pre-petition, not administrative, claims); *In re Pennsylvania Truck Lines, Inc.,* 189 B.R. 331 (Bankr.E.D.Pa. 1995) (holding that a claim which arose under a pre-petition indemnification contract was a pre-petition claim even though under applicable state law that claim did not accrue until after the petition date). In the instant case, the contract of indemnification was executed pre-petition. Consequently, Huhtamäki's contractual indemnification claim is a pre-petition claim.

Huhtamäki asserts, however, that its case is distinguishable from *Mid–American Waste* and *Pennsylvania Truck* because, unlike the creditors in those cases, Huhtamäki has two bases for its claim: a pre-petition contractual indemnification

---

**5.** New York law is applicable in this case as well.

right and a post-petition common law right of indemnification. Huhtamäki asserts that, while the first obligation may be a pre-petition claim, the second is an independent post-petition claim. In furtherance of its argument, Huhtamäki cites two New York cases which hold that common law and contractual indemnification claims may both exist. *See, e.g., North Star Reinsurance Corp. v. Continental Ins. Co.,* 82 N.Y.2d 281, 604 N.Y.S.2d 510, 624 N.E.2d 647, 652 (1993); *Hawthorne v. South Bronx Community Corp.,* 78 N.Y.2d 433, 576 N.Y.S.2d 203, 582 N.E.2d 586 (1991).

We find it unnecessary to determine whether New York law permits common law and contractual indemnification claims to exist concurrently. The Third Circuit in *Frenville* held that the court must determine the point in time when the creditor first had a right to payment in order to ascertain whether it had a claim, albeit contingent, which arose pre-petition. *Frenville,* 744 F.2d at 336. Here, Huhtamäki had a contingent "right to payment" under its contractual indemnification theory at the time the contract was executed. *Id.* at 336–37.

Huhtamäki seeks to have us extend *Frenville* to apply to cases where, as here, the claimant has both a pre-petition and a post-petition basis for the same claim. It is significant that Huhtamäki does not have two separate claims, one pre-petition and one post-petition. Rather it has one claim, with two separate legal theories. Since Huhtamäki could have asserted its claim pre-petition (under its contractual indemnification theory), we find that it had a "right of payment" pre-petition for that claim and, therefore, its entire claim is a pre-petition claim. *See* 11 U.S.C. § 101(5)(A) (defining a claim as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured").

We agree with *Mid–American Waste* and *Pennsylvania Trucks* and decline to extend *Frenville* to cases where a creditor has a pre-petition contractual indemnity claim. Therefore, we conclude that Huhtamäki's claim which is premised on theories that could be asserted in both a prepetition and post-petition suit, is nonetheless a pre-petition claim.

2. *Administrative Status*

 Even if Huhtamäki had a postpetition claim, it is not automatically entitled to administrative status. *See, e.g., In re Bellman Farms, Inc.,* 140 B.R. 986, 994 (Bankr.D.S.D.1991). The Bankruptcy Code provides administrative status to claims for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b). Determining whether a creditor has an administrative claim is a two-prong test: the expense must have arisen from a post-petition transaction between the creditor and the trustee (or debtor-in-possession), and the transaction must have substantially benefitted the estate. *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.),* 66 F.3d 1091, 1094 (9th Cir.1995); *General Am. Transp. Corp. v. Martin (In re Mid Region Petroleum, Inc.),* 1 F.3d 1130, 1133 (10th Cir.1993); *In re Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir.1976); *Mid–American Waste,* 228 B.R. at 821; *In re Molnar Bros.,* 200 B.R. 555, 559 & n. 3 (Bankr.D.N.J.1996); *In re Chateaugay Corp.,* 102 B.R. 335, 353 (Bankr.S.D.N.Y.1989).

 In this case, the first prong is absent. The Debtors and Huhtamäki did not enter into a post-petition transaction. The basis of Huhtamäki's contractual claim is the contract for the sale of Donruss to the Debtors which was executed pre-petition. Similarly, the common law indemnification claim is not premised on any post-petition contract or transaction between the Debtors and Huhtamäki. Thus, the first prong,

a post-petition transaction between the Debtors and Huhtamäki, is absent here.

Even if we concluded that there was a post-petition transaction between the Debtors and Huhtamäki, there was no "substantial benefit" conferred on the estate by Huhtamäki. To the extent that Huhtamäki satisfies the claim of MLBP, it would be satisfying a pre-petition claim which MLBP holds against the Debtors. This is not conferring a substantial benefit on the estate but is merely substituting one pre-petition creditor for another.

This is recognized by the Bankruptcy Code which specifically provides that a claim such as Huhtamäki's is entitled to general unsecured status only. Section 502(e)(2) provides "[a] claim for reimbursement or contribution of [an entity that is liable with the debtor on or has secured the pre-petition claim of a creditor] that becomes fixed after the commencement of the case shall be determined, and shall be allowed under ... this section, or disallowed under ... this section, the same as if such claim had become fixed before the date of the filing of the petition." 11 U.S.C. § 502(e)(2). Huhtamäki's indemnification claim is for reimbursement or contribution and will not become fixed until after the petition date. To the extent that it is allowed at all, Huhtamäki's indemnification claim is a pre-petition claim pursuant to section 502(e)(2). Because a pre-petition claim is not entitled to administrative status, Huhtamäki's indemnification claim is entitled only to general unsecured status.

## C. Direct Claim

Huhtamäki also asserts that it is entitled to a "direct claim" against the Debtors—independent of its indemnification rights—because the Debtors failed to give Huhtamäki any notice of the chapter 11 proceedings, including the sale of the inventory to Playoff and the agreement between the Debtors and MLBP to permit that sale. Huhtamäki asserts that as a result of the lack of notice, it has been directly and adversely affected by being deprived of its right to appear and be heard on those transactions.

### 1. Motion to Strike

█ After the submission of post-argument briefs, Huhtamäki filed a Motion to Strike the Debtors' Objection to Huhtamäki's direct claim in which it asserts that the Debtors' sole objection to the direct claim is contained in footnote 2 of the Debtors' Supplemental Brief. Huhtamäki also asserts that at the November 20, 2000, hearing, the Debtors did not challenge Huhtamäki's assertions that it has a direct claim. Huhtamäki therefore asserts that the Debtors' objection to the direct claim does not satisfy the requirements of Rule 3007 and its direct claim should be allowed.

We disagree. As of the hearing date, the only pleading in which Huhtamäki had attempted to explain or otherwise support its direct claim was its Preliminary Response. When asked by the Court at the hearing to cite any cases to support its direct claim, counsel informed the Court "we are working on that submission as we speak.... [W]e don't have that completed as we speak, but we are prepared to make a submission on that specific issue. Hopefully we will be able to do it today." *See* November 20, 2000, Transcript at p. 62. As a result, we directed counsel for the Debtors to address the direct claim after Huhtamäki had filed its submission. Huhtamäki's submission was filed on November 29, 2000, and the Debtors' response was filed on December 7, 2000. In that response, the Debtors specifically addressed the issue of Huhtamäki's direct claim in the section titled "Huhtamäki has not articulated or established a colorable direct claim against Pinnacle." The Debtors' response satisfies the requirements of Rule 3007. Therefore, we deny Huhtamäki's Motion to Strike and address the merits of the direct claim.

### 2. Merits

Huhtamäki asserts that it has a separate direct claim against the estate which is

entitled to administrative status, because the Debtors failed to give Huhtamäki any notice of the sale of inventory to Playoff and the related agreement between the Debtors and MLBP. Had it received notice, "it would have been able to protect its interests in the bankruptcy court and potentially avert the instant litigation." Huhtamäki asserts that, as a result, it has been left to satisfy its indemnification obligation to Hershey.

█ In bankruptcy, notice is of paramount importance, particularly for asset sales. *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir.1994). *See generally, Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") Huhtamäki asserts that the Debtors' failure to give Huhtamäki notice of the sale of assets to Playoff creates a claim in equity because the Debtors' conduct during its administration of the estate was unjust or unfair. *See Pepper v. Litton*, 308 U.S. 295, 307–08, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

█ While it is fundamental that notice should be sent to all parties whose interests may be affected by a sale of estate assets, we conclude that the Debtors' failure to give Huhtamäki notice is not a sufficient reason to permit Huhtamäki an administrative claim under the facts of this case. We cannot conclude that Huhtamäki was entitled to notice of the sale of the inventory to Playoff because Huhtamäki had no interest in the inventory. While it may have had an interest in any assignment of the License Agreement, because it had guaranteed performance under that

agreement, the sale to Playoff did not contemplate an assumption and assignment of the License Agreement. Therefore, Huhtamäki was not entitled to notice of the sale of the inventory to Playoff.

Huhtamäki argues, however, that it was entitled to notice of the agreement between the Debtors and MLBP where the Debtors agreed, in essence, *not* to assume and assign the License Agreement to any buyer of the inventory. That agreement, it argues, directly affected its rights by making it more likely that it would be called upon to pay on its guarantee. Furthermore, Huhtamäki asserts, if it had received notice, it could have ensured that the Debtors mitigated Huhtamäki's liability by assuming and assigning the License Agreement.

We disagree. MLBP contested the ability of the Debtors to assume and assign the License Agreement by taking the position that the License Agreement had been terminated pre-petition. Since that issue was contested, we cannot conclude that the Debtors would have been able to assume and assign the License Agreement.

Even if the License Agreement were not terminated pre-petition, we do not find that Huhtamäki has suffered any harm by not receiving notice of the Debtors' agreement to reject it.[6] For Huhtamäki to have a claim for failure to receive notice, it must establish that it was harmed by not receiving that notice. That presupposes that we would have sustained Huhtamäki's objection to the rejection of the License Agreement.

█ The Debtor's decision to assume or reject an executory contract is based upon its business judgment. *See National Labor Relations Board v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir.1982) aff'd at 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)

---

6. Rule 6006(c) provides: "[w]hen a motion is made to reject an executory contract, the court shall set a hearing on notice to the other party to the contract and to other parties in interest as the court may direct."

("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, [under] the 'business judgment' test.") Although assuming and assigning the License Agreement would have been in the best interests of Huhtamäki, it is not clear that it would have been in the best interests of the estate. Assumption of that agreement would have necessitated the immediate payment of a cure claim in excess of $2.6 million. A debtor's fiduciary duty is to maximize the value of the estate for distribution to creditors, not to minimize the exposure of an individual creditor while increasing the liability of the estate.

Huhtamäki asserts that assumption and assignment of the License Agreement would have benefitted the estate because it would have resulted in a higher price being paid by Playoff (or other bidders) for the Debtors' assets. This assertion is, however, devoid of any factual basis. There is absolutely no evidence that any bidder would have paid more than Playoff's winning bid if the License Agreement had been included in the sale. Further, there is no evidence that any increased price would have been sufficient to cover the cure amount.

Since the cure payment was at least $2.6 million, the successful bid would have had to exceed $12.2 million to justify assumption of the License Agreement. There is no evidence that Playoff (or anyone else) would have been willing to pay that much to get the MLBP License Agreement. In fact, the evidence suggests otherwise. Playoff did, subsequent to its purchase of the Debtors' assets, enter into a license agreement with MLBP to permit it to sell some (but not all) of the baseball card inventory. Under that agreement, it paid MLBP approximately $611,000. It has not agreed to pay any other royalties to liquidate the remaining inventory. This is far less than the cure claim of $2.6 million that the Debtors would have had to pay if they had been able to assume and assign the License Agreement.

Ultimately, the Debtors did not move to assume or reject the executory contract with MLBP. Instead, they reached a settlement which we approved under Rule 9019. *See Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972) ("The responsibility of the bankruptcy judge ... is not to decide the numerous questions of law and fact raised ... but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'") That settlement permitted the Debtors to sell the baseball card inventory to Playoff by paying MLBP $275,000.

Even if Huhtamäki had received notice of the sale and the MLBP agreement, we are not convinced that the result would have been any different. Huhtamäki has presented no facts which convince us that this settlement agreement between the Debtors and MLBP was unreasonable, from the estate's prospective. There is no evidence that the Debtors could have successfully asserted that the License Agreement had not terminated pre-petition. Nor is there any evidence that any bidder would have paid significantly more for an assumption and assignment of the License Agreement. Therefore, Huhtamäki has failed to sustain its burden of establishing that the Debtors would have received a greater recovery by assuming and assigning the MLBP agreement. Its direct claim must be disallowed.

 Finally, while we sit as a court of equity, our broad remedial powers do not extend to rewriting the Bankruptcy Code's priority scheme. Huhtamäki seeks to elevate its claim from general unsecured to administrative priority status because the Debtors failed to give it proper notice. Bankruptcy estates contain finite resources; elevating the priority of one creditor's claim because the debtor failed to give it notice reduces other creditors' recoveries for actions which were beyond their control. While bankruptcy courts, as courts of equity, have the power to equitably subordinate claims, we find no statuto-

ry provision permitting bankruptcy courts to elevate the priority of an existing claim. Nor has Huhtamäki cited any case law supporting its request. Therefore, even if we concluded that the Debtors were obligated, but failed, to give Huhtamäki notice, we would not conclude that the proper remedy is to elevate the priority of Huhtamäki's claim over other creditors' claims.

Accordingly, Huhtamäki's direct claim is denied.

### D. Disallowance of Contingent Contribution Claims

The Debtor asserts that Huhtamäki's claim should be disallowed pursuant to section 502(e)(1)(B), which provides:

the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor . . . to the extent that—

. . . . .

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

■ For disallowance under section 502(e)(1)(B), three criteria must be met: (1) the claim must be contingent; (2) the claim must be for reimbursement or contribution; and (3) the claimant must be co-liable with the debtor with respect to the claim. *See, e.g., In re Dant & Russell, Inc.,* 951 F.2d 246, 248 (9th Cir.1991); *Fine Organics Corp. v. Hexcel Corp. (In re Hexcel Corp.),* 174 B.R. 807, 809 (Bankr. N.D.Cal.1994); *Empire Radio Partners, Ltd. v. Brothers (In re Empire Radio Partners, Ltd.),* 1993 WL 515832 (E.D.Pa. Dec. 8, 1993); *In re Provincetown–Boston Airlines, Inc.,* 72 B.R. 307, 309 (Bankr. M.D.Fla.1987).

■ In this case, all three criteria are satisfied. Huhtamäki's claim is contingent since it depends upon a judgment being entered against Hershey and Huhtamäki satisfying that judgment. The claim is for reimbursement or contribution since it is based on Huhtamäki's claim for indemnification against the Debtors. Huhtamäki is co-liable with the Debtors since both are obligated to MLBP under the License Agreement. We therefore conclude that the claims must be disallowed under section 502(e)(1)(B). *See, e.g., Empire Radio Partners,* 1993 WL 515832 (E.D.Pa. Dec. 8, 1993); *In re Pacor, Inc.,* 110 B.R. 686 (E.D.Pa.1990); *In re Harvard Indus., Inc.,* 153 B.R. 668 (Bankr.D.Del.1993).

In response, Huhtamäki makes three arguments: first, it asserts that section 502(e)(1)(B) does not apply to its claim because its claim is an administrative claim. We have already determined that Huhtamäki's claim is not an administrative claim. Therefore, this argument fails.

Second, Huhtamäki asserts that we should not apply section 502(e)(1)(B) to its claim because such a ruling would eviscerate *Frenville.* We disagree. The *Frenville* decision did not address the allowance of claims or their priority status. Rather *Frenville* dealt with whether the automatic stay applied to a claim which arose post-petition. It did not address the allowance or disallowance of claims or, specifically, the applicability of section 502(e)(1)(B).

The *Pacor* case did address the applicability of section 502(e)(1)(B) to post petition obligations. *See In re Pacor,* 110 B.R. 686 (E.D.Pa.1990). In *Pacor,* the issue before the Court was whether future contingent asbestosis claims must be disallowed pursuant to section 502(e)(1)(B). In its analysis, the Court examined the *Frenville* decision, but found that *Frenville* was inapposite. *Id.* at 690. The *Pacor* Court concluded that, under the express language of section 502(e)(1)(B), the future contingent asbestosis claims must be disallowed.

Third, Huhtamäki asserts that section 502(e)(1)(B) does not apply to liquidation cases. Specifically, Huhtamäki attempts to distinguish this case from *Pacor* by noting that in *Pacor,* the debtor had reorganized and created a trust for future

claims, whereas here the Debtors have filed a liquidating plan. We conclude that this factual difference is insignificant for the purposes of determining the applicability of section 502(e)(1)(B). The Code makes no such distinction. On the contrary, section 502(e)(1)(B) provides that if all three criteria are satisfied, "the court shall disallow" that claim. Huhtamäki's indemnification claim satisfies all three criteria. Consequently, we conclude that the claim must be disallowed at this time.

If Hershey is found liable to MLBP by the state court, and Huhtamäki satisfies that claim, Huhtamäki's liability would no longer be contingent. At that time, Huhtamäki is free to file a motion to reconsider its claim. Under section 502(j), we could then allow it a general unsecured claim in a fixed amount.

IV. *CONCLUSION*

For the foregoing reasons, we conclude that Huhtamäki does not have an administrative claim under *Frenville* or section 503(b) of the Bankruptcy Code. Further, we conclude that Huhtamäki does not have a direct claim for failure of the Debtors to provide it notice of the agreement between the Debtors and MLBP which permitted the sale of the baseball card inventory to Playoff. Finally, we conclude that Huhtamäki's claim must be disallowed pursuant to section 502(e)(1)(B) until that claim is no longer contingent. The Debtors' Objection is therefore sustained.