### In re HUFFY CORPORATION, et al., Debtors.

#### Nos. 04–39148, 04–39167.

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

Jan. 20, 2010.

Devon Merling, Kim Martin Lewis, Dinsmore & Shohl, LLP, Cincinnati, OH, Kasey T. Ingram, Marysville, OH, for Debtors.

## DECISION GRANTING REORGANIZED DEBTORS' MOTION TO ENFORCE CONFIRMATION INJUNCTION AND DISCHARGE AGAINST TSA STORES, INC.

LAWRENCE S. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the standing General Order of Reference in this district. This matter is before the court on the Reorganized Debtors' Motion to Enforce Confirmation Injunction and Discharge Against TSA Stores, Inc. [Doc. 1786]. The motion was filed to prevent TSA Stores, Inc. ("TSA") from continuing litigation against the Reorganized Debtors, Huffy Corporation, et al. ("Huffy" [1]), for indemnification in a tort action filed in Missouri. TSA filed a memorandum in opposition to Huffy's motion [Doc. 1797]; and Huffy filed a reply [Doc. 1802]. Huffy also filed a supplemental support document [Doc. 1832] to which TSA objected [Doc. 1840]. The court held a hearing to consider the matter on February 8, 2007 at which time the parties discussed the need for a joint fact stipulation and further briefing.

For various reasons, including settlement attempts, the joint stipulation and briefs were not forthcoming until the Joint Motion to Seal [Doc.1957] filed by the parties on January 29, 2009 requesting that the parties' joint stipulation be filed under

seal. The court granted the motion [Doc. 1960] and the parties' Stipulated Statement of Facts was filed under seal on March 3, 2009 [Doc.1965]. A subsequent telephone conference held on March 18, 2009 led to the entry of an order setting a briefing schedule [Doc.1968]. The parties have now filed their briefs and responsive documents [Docs.1970–1973], also under seal, and the court is prepared to render its decision in this matter.

## SUMMARY OF THE ISSUE AND DETERMINATION OF THE COURT

The issue presented to the court is the proper characterization of TSA's claim for indemnification against Huffy as a prepetition claim discharged in Huffy's bankruptcy cases [2] or a post-confirmation claim that is not discharged and may be pursued against the Reorganized Debtors outside of this bankruptcy court. TSA's claim is based on the prepetition sale of a product, more specifically an in-ground basketball pole, allegedly manufactured by Huffy and sold at one of TSA's stores under a prepetition agreement between Huffy and TSA. The prepetition agreement included an indemnification provision. However, the injurious event triggering potential liability did not occur until after the bankruptcy filing nor did TSA or Huffy receive notice of the injurious event until after Huffy's plan of reorganization was confirmed.

The court has thoroughly researched the issue of when a claim arises for bankruptcy purposes and has found various tests

1. For the sake of simplicity, the court utilizes the label "Huffy" to refer to both the pre-bankruptcy organizations of Huffy Corporation and its related entities as well as the Reorganized Debtors unless the court deems it necessary to use a more specific label.

2. The cases of Huffy Corporation and its related entities, Case Nos. 04–39148—04–39167, are being jointly administered in bankruptcy.

created by courts to make the determination. Although the tests may lead to conflicting results in some circumstances, the appropriate outcome in this case is clear. Whether based on the prepetition conduct giving rise to the potential liability, the prepetition contractual relationship between the parties, or that tort liability was within the "fair contemplation" of the parties given their history and the nature of their indemnification agreement, TSA holds a prepetition contingent claim against Huffy. Furthermore, TSA received actual notice of the bankruptcy filing and the deadline for filing proofs of claim meeting any due process concerns that the court may have. Because TSA failed to file a proof of claim for indemnification based on tort liability, the court holds that TSA's claim is discharged in Huffy's bankruptcy cases pursuant to the terms of the confirmation order and plan. For these reasons, the court grants the Reorganized Debtors' Motion to Enforce Confirmation Injunction and Discharge against TSA.

## SUMMARY OF THE FACTS

This summary of the facts is derived from the parties' filings and the joint Stipulated Statement of Facts. Huffy and TSA had a vendor-vendee relationship prior to Huffy's bankruptcy filing. Pursuant to this relationship, Huffy allegedly sold an in-ground basketball pole to TSA that was subsequently purchased by a consumer through one of TSA's retail stores in the early 1990's and installed at a home [Parties' Stipulated Statement of Facts ("Stip. of Facts") filed under seal at Doc.1965, ¶ 1 and Ex. 2].

Years later, Huffy Corporation, and its related entities, filed their voluntary Chapter 11 petitions on October 20, 2004. On January 14, 2005, the bankruptcy court entered an order establishing March 15, 2005, as the deadline for filing proofs of claim. TSA does not dispute that it received actual notice of the deadline [Stip. of Facts, ¶ 5]. On March 14 and 15, 2005, TSA timely filed two proofs of claim, one in Huffy Corporation's main bankruptcy case and one in that of Huffy Sports, Canada, Inc.; each proof of claim totaled $102,229.06 [*Id.*, ¶¶ 8–9; Case No. 04–39148, Proof of Claim # 698–1; Case No. 04–39162, Proof of Claim # 63–1]. The basis for each claim was described as "return of defective merchandise" [Case No. 04–39148, Proof of Claim # 698–1; Case No. 04–39162, Proof of Claim # 63–1]. Attached to the proofs of claim were copies of prepetition agreements between Huffy and TSA entitled "Domestic Vendor Deal Sheet (Vendor Agreement)" [*Id.*]. The agreements include an indemnification clause [3] in paragraph 18 which states, in relevant part:

Vendor [Huffy] agrees to indemnify, defend, and hold harmless TSA, its officers, directors, employees, agents, subsidiaries, successors and assigns (the "Indemnified Parties") from any and all liabilities costs and expenses (including reasonable attorney's fees) associated with any claim, complaint, charge, penalty, demand, injury, loss or damage that arises as a result of, in whole or in part: (i) any act or omission by Vendor; or (ii) Vendor's breach of any of its representations or warranties under this Agree-

---

**3.** It is not entirely clear from the parties' filings which specific "Domestic Vendor Deal Sheets (Vendor Agreement)" or similar contractual arrangement between TSA and Huffy governs the sale of the basketball pole at issue in this case. Nonetheless, the parties appear to agree that the contract contained an indemnification clause identical to the one in the agreements attached to TSA's proofs of claim and referenced in the parties' Stipulated Statement of Facts.

ment or provided by law. In the event of any claim, suit or proceeding against any Indemnified Party in connection with any of the foregoing, TSA agrees to timely notify Vendor of any such claim, suit or proceeding.... Vendor shall promptly upon receiving notice of such claim, suit or proceeding, assume the defense of the Indemnified Parties at its sole cost, and (whether Vendor assumes such defense or for any reason fails or refuses to assume such defense) Vendor shall pay any and all sums which any Indemnified Party becomes legally obligated to pay as a result of such claim, suit or proceeding....

[*Id.;* Stip. of Facts, ¶ 11]. TSA filed no other proofs of claim in Huffy's bankruptcy cases. Huffy objected to TSA's proofs of claim and the objection was eventually resolved on August 27, 2006 pursuant to the terms of a settlement agreement[4] between the parties [Stip. of Facts, ¶ 15].

Huffy filed its plan of reorganization with the court on August 15, 2005 and, following a hearing, the court entered an order confirming Huffy's plan on September 23, 2005 [*Id.*, ¶ 12]. The plan became effective pursuant to its terms on October 14, 2005 [*Id.*, ¶ 13].

On April 4, 2006, subsequent to the bankruptcy filing and confirmation of Huffy's plan of reorganization, Donald Bellon filed a wrongful death petition against TSA in the Circuit Court of St. Louis County, Missouri (the "Bellon litigation") [Stip. of Facts, ¶ 14; Doc. 1786, Ex. A]. In the petition, Donald Bellon ("Bellon") alleges that on November 27, 2004, his wife, Mary Carol Bellon "placed her hands and weight onto [a] basketball pole and as a result of same, said pole fractured and fell upon her person ... and as a result thereof Mary Carol Bellon suffered injuries directly causing her death" [Doc. 1786, Ex. A, ¶ 10]. Bellon alleges that TSA sold the basketball pole and that the pole was unreasonably dangerous and defective at the time of the sale [*Id.*, Ex. A, ¶¶ 5–6, 11–12]. Bellon requests that TSA be held strictly liable in tort for damages caused by the wrongful death of Mary Carol Bellon [*Id.*, Ex. A, ¶¶ 11 –13].

On May 23, 2006, TSA's counsel, accompanied by an engineer, inspected the basketball pole in possession of Bellon to determine the manufacturer of the pole [Doc. 1797, Boggs Aff., ¶¶ 1–3]. TSA's counsel determined that Huffy was the manufacturer [Id., Boggs. Aff., ¶ 4].

On May 25, 2006, TSA tendered defense of the Bellon litigation by letter to Huffy [Stip. of Facts, ¶ 16; Doc. 1786, Ex. B]. TSA admits that it tendered the defense of the claim to Huffy "pursuant to Paragraph 18 of the Domestic Vendor Deal Sheets, which gave TSA a right of indemnity against Huffy" [TSA's Supplemental Brief filed under seal at Doc.1971, p. 2]. By return letter dated August 17, 2006, Huffy rejected the tender of defense asserting any claim for indemnification against Huffy was discharged in bankruptcy [Stip. of Facts, ¶ 17; Doc. 1786, Ex. C].

Subsequently, TSA filed a third party petition against Huffy in the Bellon litigation [Stip. of Facts, ¶ 18; Doc. 1786, Ex. D]. TSA asserted that Huffy, as the manufacturer of the basketball pole, is strictly liable for any defects in its manufacture

---

**4.** The parties raise an alternative issue that the settlement agreement which resolved Huffy's objection to TSA's proofs of claim may have released Huffy from future liability to TSA for indemnification including the claim at issue in this case. Because of the court's conclusion that TSA's claim of indemnification is a prepetition contingent claim discharged in Huffy's bankruptcy cases, the court need not reach the alternate issue of whether the settlement agreement constitutes a release of Huffy's liability for same.

and design [Doc. 1786, Ex. D, ¶¶ 3–4]. TSA requests contribution from Huffy in an amount proportionate to the fault of Huffy [Id., Ex. D, ¶ 6]. Huffy then filed its motion in this court to enjoin TSA from continuing prosecution of the third party petition against Huffy in the Bellon litigation.[5]

Relevant to the issue of foreseeability are the records of both TSA and Huffy demonstrating the parties' historical awareness of prior incidents involving Huffy products and injury to a person or property. The parties' combined records reflect that from approximately September of 1990 through October 14, 2005, there were a total of 230 known incidents involving Huffy products including in-ground basketball goals, portable goals, pogo sticks and bicycles [Stip. of Facts, ¶¶ 21–24]. TSA was aware of 147 of the product incidents and tendered the defense of 91 of those product claims to Huffy [Id., ¶ 24]. Of the 230 known incidents, four appeared to involve permanent, in-ground basketball poles similar to that at issue in the Bellon litigation and TSA tendered a defense to Huffy for three of them prior to the bankruptcy filing [Id., ¶¶ 25–26]. TSA also tendered a defense to Huffy in claims related to portable basketball units [Id., ¶ 27].

TSA further acknowledged the potential for product liability claims arising from the products it sells in filings with the Securities and Exchange Commission [Id., ¶ 28]. In its Form 10K for the fiscal year ended January 31, 2004, TSA noted the "risk that claims or liabilities with respect to lawsuits will exceed our insurance coverage" and that "[a]lthough we have entered into product . . . liability indemnity agreements with many of our vendors, we cannot assure you that we will be able to collect the payments sufficient to offset product liability losses" [Id.].

Finally, the parties stipulated to the fact that other prepetition creditors who were vendors of Huffy products filed proofs of claim for indemnification in Huffy's bankruptcy cases [Id., ¶ 29].

### LEGAL ANALYSIS

The issue before the court is whether Huffy's potential liability to TSA for indemnification is properly characterized as a prepetition claim that has been discharged in Huffy's bankruptcy cases or a post-petition claim that can be pursued against the Reorganized Debtors outside of the bankruptcy court. Determining when a claim arises can be a complicated issue when the claim is based on events that span a time period beginning before the bankruptcy filing, such as with a prepetition contract or the sale of a product, and ending during the life of a bankruptcy case and beyond. Many courts have struggled with this issue resulting in the formation of several tests to determine when a bankruptcy claim arises. These often conflicting tests involve a balancing of bankruptcy concepts, such as the broad definition of a claim and the purpose of a bankruptcy discharge, as well as due process concerns.

■ In order to make the determination, courts begin with the Bankruptcy Code's definition of a "claim." Section 101(5)(A) of the Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5)(A). In enacting this

---

5. Huffy also filed a Notice of Removal in the Bellon litigation to remove the matter to the District Court for the Eastern District of Missouri and answered TSA's third party petition [Stip. of Facts, ¶ 20].

broad definition of claim, Congress contemplated that " 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy' " to permit the " 'broadest possible relief in bankruptcy court.' " *Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 200 (4th Cir.1988) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), S.Rep. No. 989, 95th Cong., 2d Sess. 21–22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5807–08 and 6266). *See also Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.),* 58 F.3d 1573, 1576 (11th Cir.1995); *Baldwin–United Corp. v. Paine Webber Group, Inc. (In re Baldwin–United Corp.),* 57 B.R. 759, 764 (S.D.Ohio 1985).

 This expansive term includes a right to payment that is "contingent" in nature. 11 U.S.C. § 101(5)(A). Although the term "contingent" is not itself defined in the Bankruptcy Code, courts have concluded that contingent claims are those in which a debtor will be required to pay only upon the occurrence of a future event triggering the debtor's liability. *In re Parks,* 281 B.R. 899, 901–02 (Bankr.E.D.Mich. 2002); *In re Highland Group, Inc.,* 136 B.R. 475, 481 (Bankr.N.D.Ohio 1992). The inclusion of a contingent right to payment in the definition of a bankruptcy claim clarifies that a right to payment that is not yet enforceable under non-bankruptcy law at the time of the bankruptcy filing may still constitute a claim that is dischargeable in the bankruptcy case. *Parks,* 281 B.R. at 902; *Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Products),* 225 B.R. 862, 866 (Bankr.S.D.N.Y.1998), *aff'd,* 209 F.3d 125 (2nd Cir.2000). *See also In re Fretter,* 2000 WL 1780256, at *3 (Bankr.N.D.Ohio Sept.20, 2000) (noting that a "claim does not arise post-petition simply because the time for payment is

triggered by an event that happens after the filing of the petition").

 That contingent claims are dischargeable in bankruptcy makes sense for reasons well-stated by the court in *Baldwin–United* noting that the combined effect of a broad definition of claim and a process for estimating certain remote claims is to:

> ... bring all claims of whatever nature into the bankruptcy estate, and to give all claimants the same opportunity to share in any distribution from the estate. No longer will some creditors enjoy a windfall or effectively be denied any recovery based upon the provability or allowability of their claims and the financial status of the debtor after bankruptcy. Equally important, Congress has insured that the debtor will receive a complete discharge of his debts and a real fresh start, without the threat of lingering claims "riding through" the bankruptcy.

*In re Baldwin–United Corp.,* 55 B.R. 885, 898 (Bankr.S.D.Ohio 1985). In other words, a broad definition of claim allows a bankruptcy court to deal fairly and comprehensively with all creditors in the case and, without which, a debtor's ability to reorganize would be seriously threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct.

 Nonetheless, many courts conclude that there are outer limits to what may constitute a claim dischargeable in bankruptcy even when the claim is tied to prepetition conduct of a debtor. *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1277 (5th Cir.1994); *Piper Aircraft,* 58 F.3d at 1577–78. With respect to contingent claims, courts often discuss the need for adequate notice to creditors and procedural due process requirements found in the Fifth Amendment:

A fundamental right guaranteed by the Constitution is the opportunity to be heard when a property interest is at stake. Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests....[The court] will not require [a creditor] to subject its claim to a confirmed reorganization plan that it had no opportunity to dispute.

*In re Federated Dept. Stores*, 158 B.R. 103, 105 (Bankr.S.D.Ohio 1993) (quoting *Reliable Elec. Co., Inc. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir.1984)). Providing a creditor with adequate notice of the bankruptcy case and the deadline for filing proofs of claim is a fairly easy task when the creditor and its claim are known to the debtor at the time of the bankruptcy filing. However, providing constitutionally sufficient notice to a creditor may verge on the impossible when the claim is not known to the debtor at the time of the bankruptcy filing, nor the creditor itself, due to the fact that the claim is contingent and relies on future events for the debtor's liability to arise. An extreme example of the difficulty in providing notice to such remote creditors was posited by the Second Circuit:

Defining claims to include any ultimate right to payment arising from pre-petition conduct by the debtor comports with the theoretical model of assuring that all assets of the debtor are available to those seeking recovery for pre-petition conduct. But such an interpretation of "claim" yields questionable results. Consider, for example, a company that builds bridges around the world. It can estimate that of 10,000 bridges it builds, one will fail, causing 10 deaths. Having built 10,000 bridges, it becomes insolvent and files a petition in bankruptcy. Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail someday in the future? If the only test is whether the ultimate right to payment will arise out of the debtor's pre-petition conduct, the future victims have a "claim." Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim. The potential victims are not only unidentified, but there is no way to identify them. Sheer fortuity will determine who will be on that one bridge when it crashes. What notice is to be given to these potential "claimants"? Or would it suffice to designate a representative for future victims and authorize the representative to negotiate terms of a binding reorganization plan? To expect "claims" to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as "absurd."

*United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2nd Cir.1991) (further citations omitted). Indeed, courts have shown concern that defining a claim so broadly to include any eventual right to payment arising from a debtor's prepetition conduct would mean that claims of individuals not identifiable, or possibly not even born, at the time of the bankruptcy filing and plan confirmation could be subject to discharge in bankruptcy. *Piper Aircraft*, 58 F.3d at 1577; *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689, 703–04 (Bankr.D.Kan.2006).

Grappling with the competing interests of a broad definition of claim intended to protect a debtor's fresh start and the requirements of due process and a creditor's right to compensation, courts have created three tests to determine when claims arise: 1) the right to payment approach; 2) the conduct approach; and 3) the rela-

tionship/fair contemplation approach. *Signature Combs, Inc. v. United States,* 253 F.Supp.2d 1028, 1033–38 (W.D.Tenn.2003) (discussing the various tests); *In re Cleveland,* 349 B.R. 522, 529–30 (Bankr. E.D.Tenn.2006). The Sixth Circuit has yet to adopt a particular method. *Jeffries v. Buckley (In re Buckley),* 404 B.R. 877, 888 (Bankr.S.D.Ohio 2009). Furthermore, given the wide variety of fact situations involved with creditors and claims in reorganization cases, from a simple claim grounded in contract to claims filed by class representatives attempting to create a trust fund for future mass tort claimants, one approach may not fit all circumstances.

## A. Right to Payment Approach

■ At one end of the spectrum is the "right to payment" approach adopted by the Third Circuit in *M. Frenville Co., Inc. v. Avellino & Bienes (In re M. Frenville Co., Inc.),* 744 F.3d 332 (3rd Cir.1985). Focusing on the term "right to payment" in the definition of a claim, the Third Circuit held that, absent overriding federal law, a determination of when a right to payment arises should be based on when a state law cause of action accrues. *Id.* at 337. Consequently, if a common law claim for contribution does not accrue at the time of the commission of the underlying act but, instead, at the time of the payment of the judgment flowing from the act, then a creditor does not have a "claim" for bankruptcy purposes until, at the very least, a lawsuit is filed. *Id.* at 337–38.

The Third Circuit's approach is advocated by TSA in this case. TSA asserts that Huffy's actions forming the basis for liability to TSA may have occurred prepetition, but TSA's cause of action against Huffy, much like the claim for contribution discussed in *Frenville,* did not accrue until TSA itself was sued by Bellon after the

Huffy bankruptcy filing. TSA cites a Missouri case for the notion that a common law contribution claim does not arise until after the lawsuit against the initial defendant is filed. *See State ex rel. General Elec. Co. v. Gaertner,* 666 S.W.2d 764 (Mo. 1984) (discussing the nature of a common law claim for contribution under Missouri law).

However, *Frenville* has been widely criticized for its failure to address critical bankruptcy laws and policies. *Grady,* 839 F.2d at 201; *Signature Combs,* 253 F.Supp.2d at 1033–34. Most notably, by focusing on state law to determine when a claim arises, the theory does not fully account for the broad definition of a claim in the Bankruptcy Code that explicitly encompasses a right to payment that is unmatured or contingent. *Signature Combs,* 253 F.Supp.2d. at 1034; *Baldwin–United Corp. v. Named Defendants (In re Baldwin–United Corp.),* 48 B.R. 901, 903–04 (Bankr.S.D.Ohio 1985) (noting that *Frenville* is at odds with Sixth Circuit precedents and the Bankruptcy Code's broad definition of claim as distinguished from a cause of action for indemnification or contribution under state law). Furthermore, the approach is inconsistent with the goal of the Bankruptcy Code to provide debtors with a fresh start and a real opportunity to reorganize. *Cleveland,* 349 B.R. at 529.

For these reasons, this court, like many others, rejects the right to payment approach. *See California Dept. of Health Servs. v. Jensen (In re Jensen),* 995 F.2d 925, 929–30 (9th Cir.1993); *Grady,* 839 F.2d at 201; *Signature Combs,* 253 F.Supp.2d at 1033–34; *Baldwin–United Corp.,* 57 B.R. at 764–65; *Cleveland,* 349 B.R. at 529; *In re Roberds,* 285 B.R. 651, 657 (Bankr.S.D.Ohio 2002); *Parks,* 281 B.R. at 902.

## B. Conduct Approach

At the other end of the spectrum is the "conduct" approach adopted in *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198 (4th Cir.1988). Pursuant to the conduct approach, a claim arises at the time the debtor's conduct occurs even if the actual injury or accrual of a cause of action does not take place until after the bankruptcy filing. *Grady*, 839 F.2d at 202–03. The approach was adopted in the case of a manufacturer that filed for bankruptcy protection after facing an overwhelming number of product liability claims stemming from the use of an intrauterine device known as the Dalkon Shield. *Grady*, 839 F.2d at 199. The court addressed the nature of the claim of an individual who bought and used the device prepetition but did not know it caused a serious injury until after the manufacturer filed its bankruptcy petition. *Id.* Rejecting *Frenville* and adopting the conduct approach, the Fourth Circuit concluded that because the acts of the debtor giving rise to liability occurred prepetition, the claim was a prepetition contingent claim under the broad definition provided in the Bankruptcy Code. *Id.* at 202–03.

Huffy urges the court to adopt this approach noting that it has been more widely accepted than the right to payment approach especially when a creditor is aware of its claim and its due process rights have been observed during the case. *Eagle-Picher Indus., Inc. v. Blue Tee Corp. (In re Eagle–Picher Indus., Inc.)*, 2005 WL 4057842, at *4 (Bankr.S.D.Ohio Oct.6, 2005); *In re Johns–Manville Corp.*, 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986). However, outside of this context, the approach has also been the subject of criticism for failing to address the due process rights of creditors whose claims may be discharged before they receive any notice of the bankruptcy case or even have reason to know

that their claims exist. *Jensen*, 995 F.2d at 930; *Signature Combs*, 253 F.Supp.2d at 1035; *Cleveland*, 349 B.R. at 529.

## C. Relationship/Fair Contemplation Approach

In an attempt to better address the due process concerns of creditors, courts modified the prior approaches in two ways. Pursuant to the "relationship" test, a prepetition claim exists if: 1) the debtor's conduct giving rise to the claim occurred prepetition; and 2) some form of prepetition (or preconfirmation) relationship existed between the debtor and the creditor such as "contact, exposure, impact or privity." *Piper Aircraft*, 58 F.3d at 1577. Consequently, a class of future claimants identified as individuals likely to suffer an injury caused by a debtor's prepetition manufacture of a defective product (in this case, an aircraft) did not hold prepetition claims if they had no known prepetition contact with the debtor. *Id.* at 1578.

The relationship test has also been criticized for its potential shortcomings. It was noted that the test could define a prepetition relationship so broadly that literally any prepetition interaction between the debtor and creditor would lead to the discharge of all claims held by the creditor even those not within the parties' contemplation prior to the bankruptcy filing. *Jensen*, 995 F.2d at 930; *Signature Combs*, 253 F.Supp.2d at 1037. This led to a second twist on the conduct test called the "fair contemplation" approach.

Courts utilizing the fair contemplation approach determine that a claim exists if it is based on a debtor's prepetition conduct and can be "fairly contemplated by the parties" at the time of the debtor's bankruptcy filing. *Jensen*, 995 F.2d at 930; *Signature Combs*, 253 F.Supp.2d at 1037–38 (noting that a claim is within the fair contemplation of parties if the claimant

"could have ascertained through the exercise of reasonable due diligence that it had a claim" at the time of the bankruptcy filing); *Cleveland*, 349 B.R. at 531; *Parks*, 281 B.R. at 903.

While some courts view the relationship and fair contemplation approaches as different tests, other courts treat these approaches as functionally equivalent. *See Signature Combs*, 253 F.Supp.2d at 1036–38 (describing them as two separate tests); *Parks*, 281 B.R. at 902–03 (describing them as one test). *See also Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.)*, 239 B.R. 564, 568 (N.D.Cal.1999) (suggesting that the relationship test implicitly incorporates the notion that a future claim must be within the reasonable contemplation of the parties).

**D. Application of the Approaches Leads to the Conclusion that TSA Holds a Prepetition Claim**

■ Although the Sixth Circuit Court of Appeals has not formally voiced its opinion on the various approaches to determining when a claim arises, courts within the Sixth Circuit have adopted either the conduct or the relationship/fair contemplation tests. *See, e.g., Signature Combs*, 253 F.Supp.2d at 1038 (adopting fair contemplation approach); *Cleveland*, 349 B.R. at 531 (adopting relationship/fair contemplation approach); *Eagle–Picher*, 2005 WL 4057842, at *4 (adopting conduct approach); *Parks*, 281 B.R. at 903 (adopting relationship/fair contemplation approach). However, the court need not pick a specific approach in this case because all lead to the same result, that TSA has a prepetition claim.

First, Huffy's conduct, including the manufacture and sale of the basketball pole that allegedly caused the injury as well as the execution of the parties' indemnification agreement, occurred prior to the bankruptcy filing. Furthermore, Huffy and TSA had a vendor-vendee relationship going back to at least the time that the basketball pole was sold in the mid–1990's. In addition, the terms of the parties' prepetition indemnification agreement clearly demonstrate that TSA contemplated the possibility of liability arising from the sale of Huffy products prior to the bankruptcy filing. The language of the indemnification provision states that Huffy, as the "Vendor," agrees to indemnify, defend, and hold TSA harmless "from any and all liabilities, costs and expenses ... associated with any claim, complaint, charge, penalty, demand, injury, loss or damage that arises as a result of, in whole or in part ... any act or omission by Vendor" [Stip. of Facts, ¶ 11]. Finally, prior to the bankruptcy filing, TSA tendered defense of litigation to Huffy for other claims involving injuries allegedly caused by Huffy products including basketball poles.[6] All of these facts support that TSA was aware, prior to the bankruptcy filing, of the potential for tort liability arising from TSA's sale of Huffy products. As such, TSA could have filed a contingent claim for indemnification in Huffy's bankruptcy much like other Huffy creditors have done.

Indeed, courts facing similar facts have almost universally held that a contractual right to indemnification is a prepetition contingent claim if the contract was executed before the bankruptcy filing. *See, e.g., Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Products Corp.)*, 209 F.3d 125, 129–30 (2nd Cir.2000); *Siegel v. Federal Home Loan Mortgage Corp.*, 143 F.3d 525, 532–33 (9th Cir.1998); *Woburn Assocs. v. Kahn (In re Hemingway*

**6.** The parties stipulated that, prior to the bankruptcy filing, TSA was aware of at least four incidents involving Huffy in-ground basketball poles like the one at issue in this matter and TSA tendered a defense to Huffy for three of them [Stip. of Facts, ¶¶ 25–26].

*Transport, Inc.)*, 954 F.2d 1, 8–9 (1st Cir. 1992); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50–51 (Bankr.D.Del.2001); *Highland Group, Inc.*, 136 B.R. at 481 ("Where an indemnification agreement is entered into prior to a bankruptcy filing, such an execution gives the indemnitee a contingent prepetition claim .... [t]his is so even where the conduct giving rise to indemnification occurs postpetition"). Even under the narrow "right to payment" approach adopted in the Third Circuit, a contractual right to indemnification is recognized as a prepetition claim if the contract was executed prior to the bankruptcy filing.[7] *Frenville*, 744 F.2d at 336–37.

The court concludes that TSA holds a prepetition claim for indemnification in Huffy's bankruptcy cases. Furthermore, there is no question that TSA's due process rights were observed. TSA was an active participant in Huffy's bankruptcy proceedings having filed two timely proofs of claim. *See Manville Forest Products*, 225 B.R. at 868 (contrasting the situation of a sophisticated participant in the bankruptcy proceedings with a claimant who is a stranger to the bankruptcy and only discovers its claim after the opportunity to participate has ended). Consequently,

TSA's failure to file a proof of claim for indemnification leads to the ultimate conclusion that the claim is discharged according to the terms of the confirmation order and Huffy's confirmed plan.

### CONCLUSION

The court grants the Reorganized Debtors' Motion to Enforce Confirmation Injunction and Discharge Against TSA Stores, Inc. enjoining TSA from continuing the prosecution of its third party petition against Huffy in the Bellon litigation.

**IT IS SO ORDERED.**

---

7. In *Frenville*, the Third Circuit drew a significant distinction between an indemnification claim grounded in contract from one for indemnification or contribution based on common law principles. While a common law claim may not arise until a lawsuit is instituted, the Third Circuit recognized that one based on contract arises when the contract is executed. *Frenville*, 744 F.2d at 336–37. Consequently, the Third Circuit would generally treat a right to payment arising from a prepetition contract for indemnification as a prepetition claim. *Id. See also Pinnacle Brands*, 259 B.R. at 50 (discussing the *Frenville* holding and its distinction between a common law and contractual indemnification claim). In this case, while TSA relies on Missouri common law to support that its claim did not arise until the Bellon lawsuit was instituted, it admits that its claim against

Huffy flows from a prepetition indemnification agreement [TSA's Supplemental Brief, p. 2]. Even assuming TSA has a right to indemnification under both common law principles and contract, its claim arises for bankruptcy purposes at the earliest point when TSA could be said to have a right to payment which is at the time the prepetition contract was executed. *Pinnacle Brands*, 259 B.R. at 51 (noting that a creditor with concurrent common law and contractual rights to indemnification has a claim at the earliest point when its right to payment arose). For these reasons, it is likely that TSA's claim for indemnification grounded in contract would be treated as a prepetition contingent claim under *Frenville*; however, because the court rejects the Third Circuit's right to payment approach, the court need not resolve the issue.